**NO COPY OF THIS TRANSCRIPT MAY BE MADE PRIOR TO 10/21/10

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

```
* * * * * * * * * * * * * * * *
                              *
                              *
UNITED STATES OF AMERICA      *
                              *  09-CR-30-01-GZS
              v.              *  January 11, 2010
                              *  8:05 a.m.
EDWARD BROWN                  *
                              *
* * * * * * * * * * * * * * * *
```

TRANSCRIPT OF COMPETENCY HEARING AND SENTENCING
BEFORE THE HONORABLE GEORGE G. SINGAL

Appearances:

For the Government:   Arnold Huftalen, AUSA
                      Terry Ollila, AUSA
                      U.S. Attorney's Office
                      53 Pleasant Street
                      Concord, NH  03301

For the Defendant:    Michael J. Iacopino, Esq.
                      Brennan, Caron, Lenehan & Iacopino
                      85 Brook Street
                      Manchester, NH 03104

Court Reporter:       Diane M. Churas, LCR, CRR
                      Official Court Reporter
                      U.S. District Court
                      55 Pleasant Street
                      Concord, NH   03301
                      (603) 225-1442

2

1                    I N D E X

2

3
     Competency hearing, page 3
4
     Sentencing, page 59
5
     WITNESS:              DIRECT  CROSS  REDIRECT RECROSS
6
     SHAWN CHANNELL, Ph.D.
7
     By Ms. Ollila            5              49
8
     By Mr. Iacopino             32
9

10
     EXHIBITS:                         ID.   Evid.
11
     Government's Exhibit 1A                 27
12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    BEFORE THE COURT

 2            THE CLERK:  Court has before it for

 3   consideration this morning a competency hearing in

 4   Criminal Case 09-cr-30-01-GZS, United States of America

 5   versus Edward Brown.

 6            THE COURT:  Good morning, counsel.

 7            MR. HUFTALEN:  Good morning, your Honor.

 8            THE COURT:  Counsel, if you'd enter your

 9   appearance.

10            MR. HUFTALEN:  Arnold Huftalen for the

11   government, your Honor.

12            MS. OLLILA:  Terry Ollila for the United

13   States, your Honor.

14            MR. HUFTALEN:  With us at counsel table is

15   Dena Blanco.

16            MR. IACOPINO:  Michael Iacopino by appointment

17   of the court for Mr. Brown.

18            MR. BROWN:  You're not for this Mr. Brown,

19   sir.

20            THE COURT:  All right, counsel.  We are here

21   for a competency hearing.  I assume the witnesses are

22   present.  Counsel want to make a statement before you

23   proceed?

24            MS. OLLILA:  Not from the United States, your

25   Honor.  The witness is all ready.
```

 1          MR. IACOPINO:  I do, your Honor.

 2          THE COURT:  You do?

 3          MR. IACOPINO:  Your Honor, I would like to

 4   point out that despite my best efforts in trying to

 5   communicate with my client, he has steadfastly refused

 6   to communicate with me, to see me at the jail, even to

 7   see me even this morning prior to our hearing today.

 8          MR. BROWN:  Objection.

 9          MR. IACOPINO:  I've done my best to get the

10   various documents to him.  I cannot report to this Court

11   whether or not he has read those documents or is aware

12   of what's in there because of his refusal to communicate

13   with me, your Honor, and I just want to alert the Court

14   to that before we begin the hearing.

15          THE COURT:  All right.  Thank you.

16          MR. BROWN:  Objection.

17          THE COURT:  I've heard it.

18          MR. BROWN:  Are we rushing to judgment?  Are

19   we rushing to sentencing and judgment here, sir?

20          THE COURT:  Mr. Brown, don't interrupt.  I'm

21   going to give you an opportunity to talk.

22          MR. BROWN:  You don't have to, sir.  We know

23   who you are, sir, and what's going on in this courtroom.

24   This is not a courtroom any longer.  It hasn't been

25   since 1976 as a matter of fact, and you know that this

1   is an administrative --

2         THE COURT:  Mr. Brown, I'm going to give

3   you -- Mr. Brown, let me warn you.  If you disrupt --

4         MR. BROWN:  You just destroyed my life.

5         THE COURT:  If you disrupt the proceedings,

6   I'm going to have you removed.

7         MR. BROWN:  The three of you.

8         THE COURT:  That's your first warning.  Now

9   call your witness.

10        MS. OLLILA:  Thank you very much, your Honor.

11  The United States calls Dr. Shawn Channell.

12                SHAWN CHANNELL, Ph.D.

13        having been duly sworn, testified as follows:

14        THE CLERK:  Please be seated.  And for the

15  record, if you'd please state your name and spell your

16  name.

17        THE WITNESS:  Shawn Channell, S-H-A-W-N,

18  C-H-A-N-N-E-L-L.

19                DIRECT EXAMINATION

20  BY MS. OLLILA:

21        MS. OLLILA:  Good morning, sir.

22        THE WITNESS:  Good morning.

23     Q.   How are you employed?

24     A.   I am employed as a forensic psychologist at

25  the Federal Medical Center in Devens, Massachusetts.

1       Q.    What's your educational background, Dr.

2    Channell?

3       A.    I have a doctorate in clinical psychology and

4    a Ph.D.

5       Q.    Where'd you get your doctorate and Ph.D.?

6       A.    Western Michigan University.

7       Q.    After graduating where did you go?

8       A.    Well, prior to graduating, I completed an

9    internship at the Federal Medical Center in Rochester,

10   Minnesota.  From there I was employed as a staff

11   psychologist at the Metropolitan Correctional Center in

12   San Diego, California.

13      Q.    With respect to being employed in Rochester

14   and also in San Diego, did you have an occasion to

15   engage in any competency evaluations?

16      A.    Yes, both at Rochester and San Diego I

17   completed competency evaluations.

18      Q.    Approximately how many?

19      A.    Not a great deal.  Probably three on my

20   internship and approximately three as well when I was a

21   staff psychologist.

22      Q.    How long did you stay in San Diego?

23      A.    Four years.

24      Q.    And where'd you go after that, sir?

25      A.    I went to the Federal Correctional Institution

1    in Waseca, Minnesota, as a forensic psychologist.

2         Q.   The Federal Correctional Institute, is that a

3    Bureau of Prisons institution?

4         A.   Yes, it is.

5         Q.   And how long did you stay there?

6         A.   About two and a half years.

7         Q.   Did you have the occasion to conduct any

8    competency evaluations at that facility?

9         A.   Yes.  My primary work there was conducting

10   evaluations for federal court, and the majority of those

11   were competency.

12        Q.   Approximately how many competency evaluations

13   did you conduct?

14        A.   At Waseca, probably about 75.

15        Q.   And how long did you stay at Waseca?

16        A.   Just over two years.

17        Q.   And where were you employed after?

18        A.   My current position as a forensic psychologist

19   at the Federal Medical Center in Devens, Massachusetts.

20        Q.   How long have you been at Devens, sir?

21        A.   Since December 2005.

22        Q.   With respect to being employed at the Federal

23   Medical Center at Devens, have you engaged in any

24   competency evaluations?

25        A.   Yes.  I've done approximately 200 competency

1    evaluations at Devens.

2        Q.   And have they all been for the federal

3    government?

4        A.   Yes.

5        Q.   So in your career you conducted in excess of

6    300 competency evaluations?

7        A.   Approximately, yes.

8        Q.   Have you ever published any articles and/or

9    books?

10       A.   No.

11            MS. OLLILA:   Your Honor, at this point the

12   United States would ask that Dr. Channell be able to

13   testify in his capacity as an expert in the conducting

14   of competency evaluations.

15            THE COURT:   You may proceed with your exam.

16       Q.   Dr. Channell, when engaging in competency

17   evaluations, generally what do you do?

18       A.   Well, once the court issues an order for a

19   competency evaluation, the Bureau of Prisons

20   designations office will forward us a copy of the court

21   order.  At that point we have a secretary who begins

22   gathering documents, the court docket, contacts, the

23   prosecuting and the defense attorneys and requests any

24   information they may have.

25            When the individual arrives at the facility,

1   we conduct an intake interview during which we will

2   determine whether or not they have any current mental

3   health problems or whether or not they have any imminent

4   treatment needs and whether or not they pose a danger to

5   themselves or others.  During that interview we also

6   explain to them the purpose of the evaluation, the lack

7   of confidentiality, the other issues that would pertain

8   to the evaluation.

9       Q.   Dr. Channell, let me interrupt you there for a

10  moment.  You had indicated that as part of the initial

11  proceedings, you conduct an intake interview.  Is that

12  correct?

13      A.   Yes, that's correct.

14      Q.   When you say "we" conduct an intake interview,

15  is that you conducting an intake interview?

16      A.   Yes.

17      Q.   Now, what happens during the course of the

18  intake interview and how lengthy is it?

19      A.   It's approximately 30 minutes to an hour.  In

20  Mr. Brown's case it was approximately an hour.  As I

21  said, we go over the court order, explain the purpose of

22  the evaluation, the fact that we will be preparing a

23  report which will be submitted to the court and to the

24  prosecuting and defense attorneys, the fact that the

25  information the defendant shares during the course of

1   the evaluation isn't confidential.

2            Then we conduct a brief background interview,

3   a mental status interview to determine whether or not

4   the person has any pressing mental health concerns, and

5   we at that point would also have the defendant sign

6   release of information forms if there were, for example,

7   prior treatment records that we needed to obtain, and

8   then we make a determination about where we will house

9   the defendant and start planning the remainder of the

10  evaluation.

11       Q.   Now, Dr. Channell, you've mentioned in

12  reference Mr. Brown.  Are you referring to Edward Brown?

13       A.   Yes.

14       Q.   And do you see him in the courtroom today?

15       A.   Yes, I do.

16       Q.   Could you please point to him and describe an

17  article of clothing that he's wearing?

18       A.   He's sitting at defense counsel's table

19  wearing a khaki jumpsuit.

20            MS. OLLILA:  Your Honor, may the record

21  reflect that the witness has identified the defendant,

22  Edward Brown.

23            THE COURT:  So noted.

24            MR. BROWN:  Objection.

25       Q.   During the course of your intake interview

1   with Mr. Brown, how was his affect?  How did you find

2   him?

3        A.   He was irritated about the fact that he had

4   been referred for a competency evaluation and the fact

5   that he would have to be at the facility for that

6   evaluation.

7        Q.   Did he answer all your questions?

8        A.   For the most part, yes.

9        Q.   Did you hear anything that he said which led

10  you to believe that he might be suffering from any

11  mental illness?

12       A.   Well, he made a number of unusual statements

13  about the federal government and his beliefs about the

14  federal government and the way the government had

15  affected him, and then he also made a number of

16  statements about events that had occurred since he was

17  arrested, which, again, were unusual and indicated some

18  suspiciousness on his part, possibly some paranoia.

19            MR. BROWN:  Objection.

20       Q.   Dr. Channell, can you give some examples of

21  what Mr. Brown said --

22            MR. BROWN:  Objection.

23            THE COURT:  Be quiet, Mr. Brown.

24            MR. BROWN:  Excuse me.

25            THE COURT:  Mr. Brown --

1          MR. BROWN:  I have a right to object.

2          THE COURT:  Mr. Brown, I know you would like

3    to --

4          MR. BROWN:  I've got the evidence of what I

5    wanted to offer to Dr. Channell here to show him what I

6    was talking about.  He refused to look at it.

7          THE COURT:  Mr. Brown, I know you would like

8    to watch this proceeding.  So if you'd like to watch it,

9    you are going to keep quiet.  Otherwise --

10         MR. BROWN:  -- you rushed everything else.

11         THE COURT:  Otherwise you are going out.

12         MR. BROWN:  I understand, sir, but I still

13   object.

14   Q.    Dr. Channell, you indicated that Mr. Brown had

15   made some comments which led you to believe that he

16   might be paranoid.  What were some of those comments

17   that he made?

18   A.    Well, one in particular was that while he was

19   housed in a county jail, he believed that he was gassed

20   with chlorine bleach gas over the course of 30 days.

21         MR. BROWN:  That is of record, sir.

22         THE COURT:  Mr. Brown.

23   A.    That was an unusual comment that he had made

24   regarding an incident that had happened to him.  Just in

25   general that he had been inappropriately mistreated by

13

1    correctional staff because of his beliefs.

2         MR. BROWN:  Also --

3    Q.   You also testified, Dr. Channell, that Mr.

4    Brown had some unusual notions about the federal

5    government.  What type of things did he voice to you

6    that were concerning to you?

7    A.   Well, he doesn't recognize the authority of

8    the federal government.

9         MR. BROWN:  That's incorrect, sir.

10         THE COURT:  Just a second.  Mr. Brown --

11         MR. BROWN:  I never said that.

12         THE COURT:  All right.  Understand something,

13    Mr. Brown.  The next time you interrupt, we are going to

14    have this hearing without you present.  Do you

15    understand what I'm saying?

16         MR. BROWN:  I have the proof right here on

17    this desk.

18         THE COURT:  Like a six-year-old you are going

19    to get a five-minute timeout.  Out.

20         MR. BROWN:  Sir, you're a six-year-old.  Just

21    remember, folks, Jesse Ventura is correct.  It's not a

22    theory, it's a fact, and that judge is a criminal, he's

23    a communist --

24         (Mr. Brown exited courtroom.)

25         THE COURT:  All right.  We are going to take a

1    five-minute recess, Mr. Iacopino.  You talk to your

2    client.

3              MR. IACOPINO:  Your Honor, I just want to let

4    you know.  I highly doubt he's going to talk to me.

5              THE COURT:  Well, you talk to your client.  If

6    he's going to be quiet, I'm going to let him back in.

7    If he's going to remain disruptive, he's going to stay

8    in the cell.  We're going to have this hearing in spite

9    of his interruptions.  Five-minute recess.

10             (Brief recess taken.)

11             THE COURT:  Counsel is in court, defendant is

12   in court.  You may proceed.

13             MS. OLLILA:  Thank you, your Honor.

14        Q.   Dr. Channell, you were testifying that Mr.

15   Brown had some unusual beliefs.  One of those unusual

16   beliefs is that the court didn't have jurisdiction over

17   him and that perhaps he was being gassed while he was

18   incarcerated.  Is that correct?

19        A.   Yes.

20        Q.   Those unusual beliefs, are they indicative in

21   and of themselves of mental illness?

22        A.   No.

23        Q.   Had you ever heard similar beliefs in the

24   past?

25        A.   Well, with regard to the anti-government

1   beliefs, I have conducted evaluations on probably six or

2   seven other individuals who had similar, if not

3   identical, beliefs.

4         Q.    The evaluations on those individuals, were

5   they individuals who had strong beliefs with respect to

6   the payment of taxes?

7         A.    Some of them.

8         Q.    And were their beliefs consistent with Mr.

9   Brown's beliefs?

10         A.    Many of them were, yes.

11         Q.    Now, Dr. Channell, you indicated that you

12   gained some of this information during the course of the

13   intake, is that correct, of Mr. Brown?

14         A.    We didn't spend a great deal of time during

15   the intake talking about his beliefs with regard to the

16   government.  At that point I had primarily reviewed the

17   information already in the court docket, specifically

18   the motion for the competency evaluation, which noted a

19   number of his beliefs.

20         Q.    Did you conduct numerous interviews of Mr.

21   Brown?

22         A.    Yes.  We did three further interviews where we

23   just focused on his background history and his

24   perception with regard to, you know, the government and

25   things of that nature.  Then we did another interview

1   where we discussed specific competency related issues,

2   and we administered one psychological instrument.

3        Q.   So you conducted the intake interview.  Is

4   that correct?

5        A.   Yes.

6        Q.   And you conducted three additional interviews

7   of Mr. Brown where you got background information.  Is

8   that correct?

9        A.   Yes.

10        Q.   And approximately how long did you spend with

11   Mr. Brown during those three additional interviews?

12        A.   About six hours.

13        Q.   Were you alone during your interviews?

14        A.   No, I wasn't.

15        Q.   And who were you with?

16        A.   I supervise the interns.  We have an APA,

17   accredited predoctoral internship program.  I supervise

18   the interns on the forensic rotation.  I had an intern

19   with me during several of those interviews and also had

20   a practicum student with me during several of those

21   interviews.

22        Q.   Now, you indicated that during those three

23   interviews they took approximately six hours.  Is that

24   correct?

25        A.   Yes.

1      Q.   Is that unusual to interview someone for an

2  extended period of time?

3      A.   Well, we always interview the defendants for

4  an extended period of time, but I would say that I spent

5  more time with Mr. Brown than is typical, yes.

6      Q.   Why?

7      A.   Well, he's an individual -- first of all, he's

8  very talkative.  He has a lot to say.  He's also an

9  individual that isn't particularly amenable to a

10  question and answer type of interview.  You know, he

11  wants to talk about things on his terms, and I was fine

12  with that and allowed him to do that, and over the

13  course of conducting the interviews in that manner, he

14  provided the information which was necessary to conduct

15  the evaluation.

16      Q.   What types of background information did you

17  gain from Mr. Brown?

18      A.   What we talked about is his childhood, his

19  school history, his work history, his relationship

20  history, his criminal history, and his mental health

21  history, although he doesn't have any mental health

22  history.  We talked about that.

23      Q.   When Mr. Brown arrived at the institution, did

24  you have any information that he was currently on any

25  medications?

1      A.   No, he wasn't.

2      Q.   With respect to the interviews -- the three

3 separate interviews, did Mr. Brown say anything which

4 gave you pause with respect to whether he had any mental

5 illness?

6      A.   Well, again, he made numerous statements

7 suggesting that he'd been the target of, you know,

8 specific behavior on the part of the government to

9 harass him and/or cause him harm.  Then he also

10 continued to make a number of anti-government

11 statements.

12     Q.   Such as?

13     A.   Well, a belief that the federal government

14 is -- lacks jurisdiction, that the true government is a

15 republic, and that is the government to which he pledges

16 allegiance and not the existing federal government;

17 basically the idea that the current government has

18 subverted the real government, which was the government

19 designed by the founding fathers and the Constitution,

20 and that over the course of the last 150 years or so, a

21 number of things had occurred which had allowed the

22 government to make its citizens essentially collateral;

23 that in the thirties the government went bankrupt and

24 made its citizens collateral, and those citizens were

25 henceforth identified as strawmen or an entity which

1   didn't represent the actual or sovereign individual.

2   The sovereign individual will identify themselves

3   through the use of upper case and lower case letters in

4   writing, often using colons and hyphens within their

5   identifying of themself, whereas the strawman is an

6   individual represented by all capital letters.

7          There's an elaborate process through which

8   these individuals can regain or reclaim their strawman

9   through the use of the Uniform Commercial Code.  He made

10  a number of those types of statements, which are not,

11  you know -- interesting, credit to Mr. Brown, they are

12  statements which are standard statements of the

13  Sovereign Citizen Movement.

14       Q.   Had you ever heard of the Sovereign Citizen

15  Movement before?

16       A.   Yes, I had.

17       Q.   Had you interviewed or conducted competency

18  evaluations on individuals who held similar beliefs?

19       A.   Yes, I had.

20       Q.   Now, holding these types of beliefs, does that

21  mean that an individual suffers from some sort of mental

22  illness?

23       A.   No, it doesn't, but alternatively an

24  individual could have those beliefs and still suffer

25  from a mental illness.  So it doesn't rule any mental

1    illness in.  It doesn't rule one out either.

2        Q.   Did you rule mental illness out with respect

3    to Edward Brown?

4        A.   Yes, I did.

5        Q.   And how did you do that?

6        A.   Well, through the course of a number of

7    interviews, his history, the fact that prior to this

8    evaluation, there really had never been any cause for

9    anyone to question Mr. Brown's mental health.  He had no

10   history of mental health problems or mental health

11   treatment.  So collateral information didn't support the

12   diagnosis of a mental illness.

13           His presentation throughout the approximately

14   four weeks that he was at Devens wasn't suggestive of a

15   mental illness, and then we also administered a

16   psychological instrument which was supportive of the

17   conclusion that he does not have a mental illness.

18       Q.   What was that instrument that you provided?

19       A.   It's called a Personality Assessment

20   Inventory.

21       Q.   Is that known as a PAI?

22       A.   Yes, it is.

23       Q.   Why did you administer that test to Mr. Brown?

24       A.   It's just one further piece of information

25   that you can utilize in arriving at a diagnostic

1    conclusion.

2        Q.    What is the test like?  Is it an interview

3    test?  Is it a question-answer test?

4        A.    It's a written test that the individual takes

5    on their own.  They read the items.  They respond to

6    each item.  There's approximately 344 items.  They read

7    each item and then respond with regard to how accurately

8    the item describes them.

9        Q.    Did Mr. Brown take the PAI?

10       A.    Yes, he did.

11       Q.    Were you surprised that he took and finished

12   the PAI?

13       A.    Yes, I was.

14       Q.    Why?

15       A.    As I said, I evaluated a number of individuals

16   with similar beliefs, and typically if they participate

17   at all, they are resistant to completing any type of

18   testing, and if they do complete it, they are often --

19   some defendants that are taking it say that the results

20   are invalid.

21       Q.    How did Mr. Brown score out with respect to

22   the test?

23       A.    He was attentive to the test and responded in

24   a manner which it appeared that he was responding

25   honestly.  The results were not suggestive of any type

1    of mental health problems.

2         Q.   What were the results suggestive of?

3         A.   Normal psychological functioning.

4         Q.   During the course of your interviews of Mr.

5    Brown, did you find that he suffered from any particular

6    character traits?

7         A.   Yes, we did.

8         Q.   And what were your findings?

9         A.   We concluded that he met criteria for

10   narcissistic personality disorder.

11        Q.   What is that?

12        A.   It's a disorder -- a personality disorder

13   characterized by grandiosity, need for attention, and

14   lack of empathy.

15             THE COURT:  Excuse me.  What is a character

16   trait defined as?

17             THE WITNESS:  A character trait would be a

18   longstanding personality -- longstanding aspect of an

19   individual's personality, something that had been

20   present since adolescence or young adulthood that

21   affects the way that they perceive the world and the way

22   they interact with others.

23             THE COURT:  Thank you.

24        Q.   And can you give some examples to the Court of

25   why you determined that Mr. Brown suffered from a

1   narcissistic personality disorder?

2       A.   Well, during many of the interviews, he came

3   across as very boastful, grandiose, indicating

4   achievements which were very significant from his

5   perspective.  He also was very patronizing during many

6   of the interviews, sometimes came across as arrogant,

7   believes that he is superior in many ways to other

8   individuals, characteristics of that nature.

9       Q.   Did he ever give you any examples of his

10  superiority or his belief that he was superior to

11  others?

12      A.   Well, certainly as I indicated, he was

13  patronizing on many occasions towards me as well as the

14  intern and the practicum student that I work with

15  indicating things like I should be ashamed of myself or

16  the role that I play in the federal government and in

17  the Bureau of Prisons in particular.  Then there were

18  also his own perception of personal experiences he had

19  and his what I would deem somewhat inflated role in

20  those experiences.

21      Q.   Can you give some examples of those?

22      A.   Well, for example, when he -- in his work

23  history he talked about being fired from jobs because he

24  was so skilled in the job that he was a threat to others

25  that worked there.  In particular, he talked about a

1    period of time where he worked as an exterminator and

2    believed that he had discovered the means by which he

3    could eradicate roaches worldwide.

4           He also talked about a level of involvement in

5    things at least to the best of my knowledge that he

6    didn't have any involvement in.  For example, he talked

7    about the singer Karen Carpenter when she was dying of

8    anorexia, contacting either her family or her agent --

9    I'm not sure who in particular -- and providing them

10   advice on what she needed to do to survive.

11          He also talked about during the incident in

12   Waco, Texas, providing his advice to law enforcement and

13   being a part of that process.

14          So basically there were several things where

15   he indicated he either had a grandiose or inflated sense

16   of his importance or abilities and/or his level of

17   involvement.

18       Q.   Someone who has a narcissistic personality

19   disorder, that's not a mental illness; is that correct?

20       A.   No.  There's a distinction between what's

21   considered a mental illness and a personality disorder.

22   A personality disorder will have certainly an effect on

23   an individual's functioning but not nearly to the degree

24   that a mental illness would.

25       Q.   Now, if someone suffers from a narcissistic

1   personality disorder, does that mean that they are

2   incompetent to proceed in a court proceeding?

3        A.    No.

4        Q.    And did you find anything with respect to Mr.

5   Brown's narcissistic personality disorder which led you

6   to believe that he would have been incompetent during

7   the course of the proceedings?

8        A.    Well, I wouldn't say that it was because of

9   the narcissistic personality disorder.  One issue --

10  primary issue with regard to Mr. Brown and whether or

11  not he was competent is his failure to work with an

12  attorney, which was a concern.  Certainly something I

13  paid a lot of attention to.

14       Q.    What was the test you gave with respect to

15  competency, Dr. Channell?

16       A.    Well, I administered the Competency Assessment

17  Instrument, a revised version of that.  I wouldn't

18  characterize it as a test.  It's more of a semi-

19  structured interview, basically a question and answer

20  type of instrument.  It provides some guidance with

21  regard to the types of questions that you want to ask an

22  individual that would pertain to their competency

23  related abilities.

24       Q.    So you conducted three interviews of him.

25  There was the PAI, and there was also the Competency

1   Assessment Instrument.  Is that correct?

2        A.   Correct.

3        Q.   And the Competency Assessment Instrument is an

4   interview with Mr. Brown?

5        A.   Yes.

6        Q.   And what type of questions are contained on

7   the Competency Assessment Instrument?

8        A.   Well, primarily it addresses the individual's

9   understanding of factual information; for example, their

10  charges and the possible penalties, the role of

11  different individuals in the legal process.  It assesses

12  the individual's rational understanding of their

13  situation and their ability to work with counsel.

14       Q.   Dr. Channell, I'm showing you what is marked

15  as Government's Exhibit 1A.  I'd ask if you'd look at

16  that document, and do you recognize the document?

17       A.   Yes.  That's the revised Competency Assessment

18  Instrument that I conducted of Mr. Brown.

19       Q.   Is there handwriting on that document?

20       A.   Yes.

21       Q.   Whose handwriting is it?

22       A.   It's mine.

23       Q.   Were you taking notes during the course of

24  your interview of Mr. Brown during the Competency

25  Assessment Instrument?

1     A.   Yes, I was.

2     Q.   The instrument itself, is this a standardized

3   instrument given at the Bureau of Prisons?

4     A.   Well, it's one of several instruments that we

5   can utilize when we are conducting the competency

6   evaluation.

7          MS. OLLILA:  Your Honor, I'd ask that the ID

8   be stricken on Government's Exhibit 1A and it be entered

9   into full evidence.

10         THE COURT:  Any objection?

11         MR. IACOPINO:  No objection.

12         THE COURT:  It's admitted without objection.

13         (Government's Exhibit 1A admitted.)

14    Q.   Can you please advise the Court the types of

15  questions you asked and Mr. Brown's answers, and in

16  doing so, was there anything that led you to believe

17  that Mr. Brown did not understood the court proceedings

18  and what happened to him?

19    A.   No, there was not.

20    Q.   So what were the questions you asked him?

21    A.   Well, I asked him a number of questions.  Do

22  you want me to go through each of them?

23    Q.   Sure.

24    A.   All right.  I asked him what he was charged

25  with.  Do you want me to provide his responses as well?

1      Q.   Yes.

2      A.   He indicated he was charged with income tax

3   evasion, failure to file, his new case, crimes against

4   the United States, interfering with the duties of a

5   federal officer, explosives charges, gun charges.  He

6   indicated a belief that these charges were, as he called

7   them, insanity and that he was not allowed to provide

8   his side of the case.

9           I asked him if the charges were a felony or a

10   misdemeanor, and he indicated that the charges were a

11   felony, felonies.  And I asked him if he was found

12   guilty, what the possible sentences that he could

13   receive were, and he indicated that he could receive a

14   minimum of 36 years for one charge out of 17 charges.

15   And if convicted, I asked him where he would serve his

16   sentence, and he indicated prison.  I asked him if he

17   was found not guilty, what would happen?  He indicated

18   he would go home and become a steward of the land again.

19   I asked him what the various pleas that a person can

20   enter in court are, and he indicated that those were

21   nolo contendere, not guilty, and not guilty by reason of

22   insanity.

23           With regard to the plea of not guilty, I asked

24   him what that meant.  He indicated, that means you

25   didn't do anything.  You are innocent.  He stated that

1    he didn't believe it means innocent, but it means

2    something else.

3            I asked him what the plea of guilty meant, and

4    he indicated that under the new law I would imagine it

5    means you did something wrong.  Not guilty by reason of

6    insanity, he indicated that it meant that an individual

7    wasn't able to actualize a reason or know the difference

8    between right and wrong.

9            I asked him how he felt he could be defended

10   against the charges, and he indicated that if the Court

11   would allow him to have his witnesses and evidence,

12   which had been disallowed -- he stated that the

13   prosecution was allowed numerous witnesses and he was

14   allowed none.

15       Q.   What about the participants in the proceeding;

16   the Court, the judge, the prosecutor, the defense

17   attorney, the jury?  Did you ask him types of questions

18   which gave you the indication that he understood what

19   the roles of the various participants were?

20       A.   Yes, I did.

21       Q.   And what were the types of questions you asked

22   him?

23       A.   I asked him what the role of the defense

24   attorney was, and he indicated they are supposed to work

25   with the defendant to preserve their rights.  I asked

1    him what the role of the prosecuting attorney was, and

2    he indicated their role was to seek out the truth and

3    the facts in the courtroom, not just to stand there and

4    make accusations.  I asked him what the role of the

5    judge was, and he indicated they should be there with

6    the Bible in one hand and the Constitution in the other,

7    obviously the court process, not just tell everybody

8    what to do.

9            I asked him the role of the jury, and he

10   indicated they should determine the fact of law and that

11   the judge shouldn't intervene with the role of the jury.

12           The role of the defendant, he described the

13   defendant as being isolated even if they have an

14   attorney, and he described the legal process as a

15   one-sided game; that no matter what you do, it's a

16   lose-lose situation.  He basically indicated that the

17   judge and the AUSA work together on these cases.

18       Q.   Dr. Channell, was that his opinion or was that

19   his understanding of how the system worked?

20       A.   Well, I think it's both his opinion and his --

21   it's not his belief about how the system should work,

22   but it's his belief about how the system does work.

23       Q.   In his case?

24       A.   Certainly, yes.

25       Q.   What about the court proceedings itself?  Did

1   he give you any indication that he didn't understand

2   what court proceedings were?

3       A.   No.

4       Q.   What type of questions did you ask him with

5   respect to the court proceedings and what were his

6   answers?

7       A.   I asked him about whether or not it was a

8   requirement that defendants testify, and he indicated

9   that there wasn't.  He understood that if he did

10  testify, he would be expected to tell all the facts to

11  the best of his ability.  Those were the primary issues

12  I talked about in that area.

13      Q.   What about legal strategies?  Did you ask him

14  questions about potential legal strategies that he or

15  his counsel would utilize?

16      A.   Yes.

17      Q.   And what were the questions you asked and what

18  were his answers?

19      A.   Well, in general he indicated that he does

20  have information and witnesses and documentation that he

21  would provide in his defense but that the Court had not

22  allowed him to do so.

23      Q.   Was there anything during the course of your

24  interview of Mr. Brown during the course of the

25  Competency Assessment Instrument which led you to

1  believe that he didn't fully understood the proceedings?

2      A.   No.  I think he's a very intelligent

3  individual that has a good understanding of what should

4  happen in a courtroom.  Certainly his impression of how

5  it transpires is affected by his significant

6  anti-government beliefs.

7      Q.   Do you have an opinion, Dr. Channell, as to

8  whether or not the defendant, Edward Brown, is competent

9  for these proceedings?

10     A.   Yes, I do.

11     Q.   And what is your opinion?

12     A.   I believe that he is competent to proceed.

13          MS. OLLILA:  May I have a moment, your Honor?

14          (Pause.)

15          MS. OLLILA:  I have nothing further.  Thank

16  you, your Honor.

17          THE COURT:  Mr. Iacopino?

18          MR. IACOPINO:  Thank you, your Honor.

19                      CROSS-EXAMINATION

20  BY MR. IACOPINO:

21          MR. IACOPINO:  Good morning, Doctor.

22          THE WITNESS:  Good morning.

23     Q.   If I can just go back, I'd just like to get an

24  overview first of exactly the time that you spent with

25  Mr. Brown.  You mentioned an intake interview.  Did that

1   occur on October 7, 2009?

2          A.   No, it didn't.

3          Q.   What day did the intake interview occur on?

4          A.   The 1st of October.

5          Q.   And was that conducted in the same fashion as

6   your other interviews that you had with a student and an

7   intern there with you?

8          A.   I believe they were both there then, yes.

9          Q.   If I understand correctly, that interview

10  primarily just dealt with history and background and did

11  not get too much into assessment of competency.  Is that

12  correct?

13         A.   Yes, it's fairly laid out.  Basically it's

14  just to determine whether the individual is safe at that

15  point in time, whether or not there is any records we

16  need to get and where we should house them in the

17  facility.  It's not a particularly in-depth interview.

18         Q.   And you had three separate interviews with Mr.

19  Brown three days in a row; correct?

20         A.   Yes.

21         Q.   That was October 7th, October 8th, and

22  October 9th?

23         A.   Correct.

24         Q.   And then this competency assessment interview

25  occurred on October 14th.  Is that correct?

1      A.   Yes.

2      Q.   And when was the PAI that the prosecutor

3  mentioned?  When was that conducted?

4      A.   That was on the 20th of October.

5      Q.   In your report you indicate that during the

6  course of your evaluation of Mr. Brown, you reviewed

7  various documents.  Did you review the pro se pleadings

8  that he filed in this court?

9      A.   Yes.

10      Q.   Did you review all of them?

11      A.   I don't know that I reviewed all of them.

12      Q.   How did you go about getting those pleadings

13  and determining which ones to review?

14      A.   Well, we requested records from both the

15  government and yourself, and we also have access to

16  Pacer where we are able to pull up the docket and the

17  related documents from the docket.

18      Q.   So you would have had access to the entire

19  court docket as far as, say, pleadings go; is that

20  correct?

21      A.   Yes.

22      Q.   You indicate that upon your first meeting with

23  Mr. Brown, there was some things that caught your

24  attention.  I take it those are things that you felt you

25  should look into further, especially with respect to his

1    beliefs; is that correct?

2         A.   Yes.

3         Q.   And that's because a firmly held belief that

4    would be incorrect to the rest of the world is something

5    that can be an indicator of a mental illness; isn't that

6    correct?

7         A.   Yes.

8         Q.   And sometimes referred to as a delusion; isn't

9    that correct?

10        A.   Yes.

11        Q.   And delusions can be bizarre or non-bizarre;

12   correct?

13        A.   Yes.

14        Q.   And a non-bizarre delusion is one which, as I

15   understand it, please correct me if I'm wrong, is one

16   that -- it could be true.  I mean, it could be true, but

17   if it's a delusion it is not; correct?

18        A.   That is correct, yes.

19        Q.   And there is a diagnosis recognized in your

20   field of delusional disorder.  Is there not?

21        A.   Yes, there is.

22        Q.   And that is recognized as a mental illness;

23   isn't that correct?

24        A.   Yes, it is.

25        Q.   And please give us the definition of that.

1    A.   A delusional disorder is a condition where an

2    individual does experience non-bizarre delusions as

3    you've just described, and that certainly within the

4    realm of those delusional beliefs it will affect their

5    level of functioning, but in all other areas their

6    functioning tends to remain relatively high or normal,

7    to use the common expression.

8    Q.   And it's fair to say that it's recognized that

9    people who suffer from delusional disorder oftentimes

10   escape mental health treatment over the course of their

11   lives; isn't that correct?

12   A.   That can happen, yes.

13   Q.   And it's primarily because a delusional

14   disorder tends to affect just that particular area of

15   their life; isn't that correct?

16   A.   Yes.

17   Q.   And if somebody suffered from delusions or a

18   delusional disorder that went to sort of the origins of

19   law and where law comes from, that might affect them in

20   the legal setting; isn't that correct?

21   A.   Yes.

22   Q.   Now, I just want to go through a list of

23   things, as I understand the exhibits that I've been

24   provided correctly, you observed in your evaluation of

25   Mr. Brown.  If I understand correctly, on October 7,

1   2009, and maybe one or two times after that, Mr. Brown

2   expressed to you that he had been abused at the Wyatt

3   Detention Facility; is that correct?

4       A.   That is correct.

5       Q.   Are you familiar with the Wyatt Detention

6   Facility?

7       A.   Yes, I am.

8       Q.   Do you often see -- because you are in New

9   England, do you often see patients that have come

10   through that facility at one point or another?

11       A.   Yes, I do.

12       Q.   He complained to you that at the Wyatt

13   facility he was gassed for three days; correct?

14       A.   Yes, he did.

15       Q.   Are you aware of any treatment or any type of

16   conduct that goes on at the Wyatt facility which would

17   be the equivalent of being gassed?

18       A.   No, I'm not.  Well, let me clarify that.

19   There are situations -- for example, if they are trying

20   to extract an inmate from a cell and they are being

21   hostile and uncooperative where they may utilize as a

22   correctional technique to get them out, for example, CS

23   gas or pepper spray.  But beyond that I'm not aware of

24   any type of gassing.

25       Q.   And in the course of your evaluation of Mr.

1    Brown, did you determine whether or not he'd ever been

2    extricated from his cell at Wyatt Detention Facility?

3         A.   I had no information to indicate that that had

4    ever happened.

5         Q.   Did you look?

6         A.   I did, yes.

7         Q.   He also complained that at the Wyatt facility

8    he was put in a room that was 50 degrees with a 10-knot

9    wind blowing.  Isn't that correct?

10        A.   That is correct.

11        Q.   Are you aware of any cell or cellblock in the

12   Wyatt facility where that environmental condition could

13   occur?

14        A.   No.

15        Q.   He immediately complained to you in your first

16   interview that these people, the U.S. Attorney's Office,

17   were trying to kill him and his wife; correct?

18        A.   Yes.

19        Q.   In that first interview he told you that our

20   government is an experimental government; isn't that

21   correct?

22        A.   Yes.

23        Q.   He told you that the government has been lying

24   to us since the Civil War; correct?

25        A.   Yes.

1    Q.   And he told you that that's a fact of record.

2    Isn't that correct?

3    A.   Yes, he did.

4    Q.   He told you that he was arrested by 30 agents

5    with machine guns because he was using UCC law, didn't

6    he?

7    A.   I don't recall the exact number, but yes, that

8    sounds correct.

9    Q.   He told you that there was a bankruptcy of the

10   United States Government during the Civil War?

11   A.   Yes.

12   Q.   And that it was finished off in 1933; correct?

13   A.   Yes.

14   Q.   He complained about this Court and the fact

15   that that flag behind you has a gold fringe on it; did

16   he not?

17   A.   Yes, he did.  I don't know if he complained

18   about it, but I think he indicated that was a reason

19   that this court doesn't have jurisdiction over him.

20   Q.   He complained that the judge and the COs that

21   he runs into at the various prison facilities are all

22   Freemasons.  Isn't that correct?

23   A.   Yes.  Again, I don't know that he said all of

24   them were.  He indicated a number of correctional

25   officers are Freemasons.

1    Q.   In fact, he subscribes to the conspiracy

2    theory with respect to the Freemasons.  Does he not?

3    A.   He attributes a great deal of -- yeah, I think

4    a conspiracy theory is probably a fair representation of

5    how he perceives their role.

6    Q.   And he also has a belief that there's a Zion

7    conspiracy as well.  Correct?

8    A.   Correct.

9    Q.   He also believes -- did he mention to you his

10   belief about the Illuminati?

11   A.   I've certainly heard that statement --

12   Q.   I'm only concerned if you heard it from him.

13   A.   I can't recall if he indicated anything about

14   the Illuminati to me.  It's certainly possible, but I

15   don't recall specifically.

16   Q.   He cited you House Resolution 192 for the

17   proposition that the federal government ceased to exist

18   in 1933?

19   A.   Yes.

20   Q.   He alleged to you that the assassination of

21   John F. Kennedy was a conspiracy?

22   A.   Yes.

23   Q.   That the government -- in fact, the United

24   States Attorney's Office was involved in.  Correct?

25   A.   He indicated for the most part that the U.S.

41

1    Attorney's Office was involved in a number of interests

2    throughout the last 50 or 60 years.

3        Q.    He asserted to you that Waco was actually a

4    government conspiracy and that the U.S. Attorney's

5    Office was involved in that; correct?

6        A.    Yes.

7        Q.    He asserted to you that the U.S. Attorney's

8    Office was involved in the incident that occurred at

9    Ruby Ridge with Randy Weaver.  Did he not?

10        A.    Yes.

11        Q.    He asserted to you that the U.S. Attorney's

12    Office was involved in the bombing of the Murrah

13    Building in Oklahoma City.  Did he not?

14        A.    Yes.

15        Q.    He asserted to you that the U.S. Attorney's

16    Office was involved in the attack on the World Trade

17    Center on September 11th, 2001?

18        A.    Yes, he did.

19        Q.    You spoke about the Sovereign Citizen Movement

20    and other anti-government movements.  It's fair to say

21    that the beliefs that you are aware of don't usually

22    involve the U.S. Attorney's Office.  Isn't that correct?

23        A.    That is correct, yes.

24        Q.    It involves government conspiracy to do these

25    things at much different levels, usually on a political

1    level.  Isn't that correct?

2        A.   Well, certainly Mr. Brown's assertion is that

3    the U.S. Attorney's Office involvement in his

4    political -- often these theories don't necessarily

5    identify the exact branch of the government that's

6    involved.  It's just the government, the federal

7    government, but you are correct.  They rarely would

8    identify the U.S. Attorney's Office specifically.

9        Q.   So it's fair to say that Mr. Brown's beliefs

10   are different in that regard than those amongst the

11   subculture, at least that you are aware of.  Isn't that

12   correct?

13       A.   Yes.

14       Q.   Sir, the PAI that you testified about, that's

15   the only scored instrument or scored test that you used

16   in this particular case; correct?

17       A.   Yes, it is.

18       Q.   And it's designed by psychiatrists and

19   psychologists for the purpose of assisting you in making

20   a determination as to whether somebody is suffering from

21   a mental illness or a personality disorder or some other

22   disorder.  Isn't that correct?

23       A.   Yes.

24       Q.   It's not meant to be a -- you're not supposed

25   to diagnose solely on the basis of a PAI.  Isn't that

1   correct?

2        A.   That's correct.

3        Q.   In fact, you are supposed to do additional

4   psychological testing if issues arise; isn't that

5   correct?

6        A.   No, I wouldn't necessarily agree with that.  I

7   mean, I think if an issue arises, you certainly want

8   other information.  There really isn't a great deal of

9   other -- I mean, the only other test you might give

10  would be, for example, an MMPI-2, but those tend to

11  be -- you're measuring the same type of thing.  So it

12  would be fairly redundant to administer another test.

13       Q.   To administer another test that's designed to

14  do the same thing that the PAI does; correct?

15       A.   Yes.

16       Q.   But there are certainly other psychological

17  testing instruments out there that would measure or help

18  you in making a diagnosis with respect to issues that

19  don't come up on the PAI; isn't that correct?

20       A.   Well, certainly there are psychological

21  instruments, measures of intellectual functioning, but

22  those aren't measures of personality functioning.

23       Q.   But you undertook no intellectual functioning

24  testing for Mr. Brown; correct?

25       A.   No, I didn't.

44

1    Q.   For a layperson like me, basically IQ testing?

2    A.   Correct.

3    Q.   You did no neuropsychological testing in order

4  to determine whether or not there was a neurological

5  issue underlying Mr. Brown's psychology.  Isn't that

6  correct?

7    A.   I did no neuropsychological testing; that's

8  correct.

9    Q.   And he's 67 years of age; isn't that correct?

10    A.   Yes.

11    Q.   Did you do any testing to determine if he has

12  been beset by any level of senility?

13    A.   I didn't do any testing.  I certainly didn't

14  -- I spent a great deal of time with him and didn't

15  encounter any indication of that.

16    Q.   Senility is oftentimes attributed to

17  neurological features; isn't that correct?

18    A.   Yes.

19    Q.   And on that PAI, there is a section --

20  actually let me just back up because I might have this

21  wrong.  As I understand it correctly, the PAI is like a

22  multiple choice test for your patient; correct?

23    A.   Well, it's more of a Likert Scale than

24  multiple choice where they would choose, you know, to

25  what degree an item is reflective of their experiences.

1        Q.    But it's done in the same way like an SAT test

2    is done.  You fill in little circles with a No. 2

3    pencil?

4        A.    That's correct.

5        Q.    And then that's scored by a computer; is that

6    correct?

7        A.    That is correct.

8        Q.    And then the computer itself will print out

9    sort of a report; isn't that correct?

10       A.    Yes.

11       Q.    And one of the things that the computer prints

12   out in its report is a critical item endorsement

13   section.  Isn't that correct?

14       A.    Yes.

15       Q.    And in Mr. Brown's case, there was a critical

16   item endorsement printout?

17       A.    Yes.

18       Q.    So in other words, the computer was saying you

19   need to look at these things; correct?

20       A.    Yes.

21       Q.    Because they are critical; right?

22       A.    Well, I don't know that I would describe

23   that -- necessarily describe it in that way, but these

24   were specific items which he answered in a way that were

25   atypical.

1    Q.   And one of those was the statement that he

2    endorsed that, "Sometimes it seems that my thoughts are

3    broadcast so that others can hear them."

4    A.   Yes.

5    Q.   And another critical item endorsement was

6    that, "I am the target of a conspiracy."

7    A.   Yes.

8    Q.   And those are both critical item endorsements

9    that go to delusions and hallucinations; isn't that

10   correct?

11   A.   Well, they could.  I certainly would not

12   ascribe that they do go toward them.  As I indicated

13   previously, there were no elevations.  He didn't come

14   close to elevating on anything indicative of mental

15   illness on the PAI.  Those -- responding to those items

16   in isolation like that, no, they are not indicative of

17   mental illness.

18   Q.   Is it fair to say that thought broadcasting is

19   a core element of several mental illnesses?

20   A.   Yes.

21   Q.   Schizophrenia?

22   A.   Yes, but I don't think there is any question

23   that Mr. Brown has schizophrenia.

24   Q.   But it's a core element of that type of

25   disorder.  Those are serious mental illnesses; correct?

1        A.   Yes.

2        Q.   In fact, the way that the PAI reports this

3   critical item endorsement for these very two

4   endorsements that came out in his testing is under

5   delusions and hallucinations.  Isn't that correct?

6        A.   Yes.

7        Q.   Yet you took no further psychological testing?

8        A.   Again, I'm not sure what other psychological

9   testing you would be referring to.  There really

10   wouldn't be other testing that you would undertake

11   because of those responses.

12        Q.   I just want to find one other thing -- or

13   address one other thing with you.  You indicated that

14   you were surprised that Ed Brown actually sat for the

15   PAI.  Correct?

16        A.   Yes.

17        Q.   And that's because -- if I understand

18   correctly what you said on direct testimony is that it's

19   because other people that you have dealt with in this

20   so-called Sovereign Citizen Group, they have generally

21   either refused to take the testing or undertaken some

22   manner to try to not answer -- not give their best

23   effort on the test.  Isn't that correct?

24        A.   Yes.

25        Q.   He's different than the other individuals that

48

1  you have been exposed to with regard to this Sovereign

2  Citizen Group, isn't he?

3      A.   Well, every defendant that I evaluate is

4  different from one another.  They are all individuals

5  and they all have their own personality characteristics

6  which would make them different from one another.

7      Q.   But it's fair to say that Ed Brown has his own

8  beliefs within the scope of these beliefs that are

9  different than those other people.  Isn't that correct?

10     A.   He certainly has individualized beliefs that

11 are his own which may -- which may not be the same as

12 other individuals that he had in that subset.

13     Q.   In your evaluation of him, it's fair to say he

14 firmly believes in those; correct?

15     A.   Oh, absolutely, yes.

16     Q.   And they primarily deal with issues of law and

17 issues that would occur in the courtroom.  Isn't that

18 correct?

19     A.   Yes.

20     Q.   He also told you that he did not have an

21 attorney; correct?

22     A.   Well, he acknowledged having so-called standby

23 counsel.

24     Q.   And who did he say that counsel represented?

25     A.   The strawman.

1    Q.   He complained to you that he couldn't put on

2    his evidence.  Are you aware of that complaint?

3    A.   Yes.

4    Q.   Did you do any kind of background checking to

5    see if in fact he had been able to put on his evidence?

6    A.   Well, we reviewed the transcripts from the

7    prior hearings.

8    Q.   So you are aware that he actually testified in

9    his own defense at his trial?

10   A.   Yes.

11   MR. IACOPINO:  I have no further questions.

12   THE COURT:  Thank you.

13   MS. OLLILA:  A few follow-up, your Honor.

14   THE COURT:  Go right ahead.

15                   REDIRECT EXAMINATION

16   BY MS. OLLILA:

17   Q.    Dr. Channell, Defendant Edward Brown is not

18   schizophrenic; correct?

19   A.    Yeah, I can say definitively that he is not

20   schizophrenic.

21   Q.    With respect to all of the assertions made

22   during Defendant Brown's interview with you; for

23   example, the ones laid out by Attorney Iacopino, that he

24   was gassed at the Wyatt Correctional Facility, that he

25   was placed in a cell that was 50 degrees with a 10-knot

1   wind blowing, that the United States Attorney's Office

2   is trying to kill him, that he was arrested by 30 agents

3   with guns drawn, that the government is bankrupt, that

4   the notion of Freemasons exists, that the judge and the

5   correctional officers are members of Freemasons; he

6   mentioned the Zionist government, the Illuminati.  Does

7   that mean that he is delusional?

8        A.   No.

9        Q.   Did you find in any way that Defendant Edward

10   Brown suffered from a delusional personality disorder?

11       A.   All of the statements that you just indicated

12   can be explained by his anti-government beliefs and/or

13   his narcissistic personality disorder and they are not

14   attributable to a major mental illness.

15            MR. OLLILA:  Nothing further.

16            THE COURT:  Counsel, we've received the

17   report.  Counsel has it dated 12/1/09.

18            MS. OLLILA:  That's correct.

19            THE COURT:  It's my understanding that this

20   report is evidence in this hearing.

21            MS. OLLILA:  That's correct, your Honor, and

22   it's under seal.

23            THE COURT:  Mr. Iacopino, do you disagree?

24            MR. IACOPINO:  No, I don't disagree, your

25   Honor.

1          MS. OLLILA:  I believe it's under seal, your

2     Honor.

3          THE COURT:  I will consider it part of the

4     record.

5          Doctor, I have a question.  Counsel, feel free

6     to object.  I'm reading from the report just so you can

7     explain to me what you mean to be saying here.  You

8     indicate in the report as follows:  A, quote, delusion

9     according to DSM-IV-TR is, quote, a false belief based

10    on incorrect inference about external reality that is

11    firmly sustained despite what almost everyone else

12    believes and despite what constitutes incontrovertible

13    and obvious proof of evidence to the contrary, end

14    quote.

15         The beliefs endorsed by Mr. Brown during the

16    current evaluation in court and pleadings and notices

17    and to his attorney are certainly unusual, convoluted,

18    and unrealistic.  Further, he continues to hold these

19    beliefs despite overwhelming information to the

20    contrary.  However, the beliefs held by Mr. Brown are

21    also those held by a widespread subculture in the United

22    States commonly referred to as the Sovereign Citizen or

23    Patriot movements.  By definition delusions exclude

24    those beliefs which are shared by other members of an

25    individual's culture or subculture.  Because the

1    unconventional beliefs held by Mr. Brown are also those

2    of a defined subculture, they are considered neither

3    delusional nor indicative of a major mental illness.

4           Would you explain what that means?

5           THE WITNESS:  Yes, your Honor.  Basically what

6    that means is that while an individual may subscribe to

7    beliefs or hold beliefs which are unrealistic and/or

8    possibly untrue which they continue to hold despite

9    evidence to the contrary, those types of beliefs aren't

10   indicative of a delusion if they are also beliefs which

11   are held by a subgroup or subculture to which they are a

12   part.  So, for example, as a way of analogy, while

13   individuals who are part of a number of organized

14   religions may hold beliefs which on the face of them

15   appear unrealistic or untrue despite evidence to the

16   contrary, because those are beliefs held by that group,

17   that subgroup, those would not be considered a

18   delusional belief.

19          THE COURT:  Thank you.  Counsel have any

20   additional questions?

21          MS. OLLILA:  No further questions.  Thank you,

22   your Honor.

23          THE COURT:  Mr. Iacopino?

24          MR. IACOPINO:  Nothing further, your Honor.

25          THE COURT:  Call your next witness.

1          MS. OLLILA:  The United States has no further

2     witnesses, your Honor.

3          THE COURT:  Mr. Iacopino, do you have a

4     witness?

5          MR. IACOPINO:  No witnesses, your Honor.

6          THE COURT:  Government, do you want to make a

7     statement?

8          MS. OLLILA:  Based on the testimony of Dr.

9     Shawn Channell, your Honor, I think there is -- no

10    conclusion could be drawn that Mr. Brown suffers from

11    any mental illness and that all of the factors indicate

12    that he is competent to proceed, that he was competent

13    to proceed during the course of the trial; that he

14    understands the roles of the parties, his attorney, your

15    Honor, the prosecutors.

16         Although his beliefs with respect to the U.S.

17    Government are unusual, he's not delusional in any way.

18    He's therefore competent to proceed for sentencing.

19         THE COURT:  Mr. Iacopino, before we conclude

20    the competency hearing, is there a statement your client

21    wishes to make with regard to competency?  I'm going to

22    hear him with regard to sentence for whatever reasonable

23    period of time he wishes to talk, but we are talking

24    about competency.  Is there a statement -- he can make

25    it or not.  It's up to him.

1          MR. BROWN:  Of course.  Thank you.  I wish to

2    thank Dr. Channell for his evenhanded, which surprised

3    me, conclusion.  The narcissistic part of it is probably

4    a little bit true.  I think in order to do what I do and

5    even what the judge does, and of course we know the

6    attorneys all are extremely narcissistic to do their

7    business.  We all have a little bit of that in us.

8    Thank you very much for that.

9          However, regarding my competency, I've

10   always -- and probably this is narcissistic a little bit

11   coming into my life.  I felt that I was probably at some

12   times the most normal man in the room because all I was

13   ever trying to do is help everybody in the room and yet

14   I kept getting hit from all quarters.  Let's get the

15   facts out so that we can prove my competency or prove

16   whether I'm right or wrong.  But that was never allowed,

17   which I could never understand.

18         So the statement just came through.  No, I did

19   not understand what happened during the trial, in the

20   first trial.  I didn't understand what happened with Mr.

21   Muirhead's arraignment.  I did not understand what

22   happened at the first trial.  That's why we left the

23   trial.  Because when I was told we could not have

24   evidence or witnesses, yeah, I was very incompetent, and

25   I didn't know at the time what I know today, and I have

1    to thank the U.S. Attorney's Office.  I have to thank

2    this Court for actually keeping me two years in prison

3    which gave me the time finally to study the rest of the

4    information of the investigation that we have been

5    conducting, and this still regards the competency

6    because I was totally incompetent to be before that

7    magistrate and to be before the Court in that first

8    trial.  I did not know that this Court was operating

9    under a different form of law.  I thought it was under

10   common law.  I thought it was a tax hearing.  I walked

11   in solely unprepared.

12           I did know that I had no business using an

13   attorney, that I needed a lawyer.  I'm sure the Court

14   understands what that is, and it goes on further, and

15   during the allocution I will explain it much further.  I

16   think everyone will understand from this point on -- I'd

17   like to just read one paragraph here of exactly who I am

18   and where I came from from the very first of this

19   entire --

20           THE COURT:  Do you want to do this, Mr. Brown,

21   as part of your allocution if we get to sentencing

22   rather than now?  Right now we are only dealing with the

23   issue -- I'm to let you read it, all right?  But we're

24   dealing here with competency.

25           MR. BROWN:  Yes.  So the Court knows this as

1    well, too.  I have to report -- as a United States

2    Constitution Ranger first and foremost, I am obligated

3    to report to the government of the United States of

4    America when I find a criminal element or cell or any

5    kind of criminal organization within the governmental

6    structure, and because I have been sequestered for the

7    past two years, I was unable to do that.  I was trying

8    to do that during the court case that was tried to begin

9    with.  That is what it was all about.  That is perhaps

10   why Mr. Iacopino feels that I am a little delusional.

11           But everything I say, ladies and gentlemen, is

12   of absolute fact, and I have the evidence, but the Court

13   for some reason in the first trial -- and of course I'm

14   disappointed in the second trial -- I was never for some

15   reason or procedure or something not allowed to present

16   this information which would conclude to fact.

17           So yes, during the allocution I will present

18   them.  All of this needs to be presented because I need

19   to present to you who this cell is and exactly how they

20   operate, sir.

21           THE COURT:  Thank you, Mr. Brown.  I will give

22   you the opportunity certainly for allocution.

23           All right, counsel.  Based on the report dated

24   December 1st, 2009, contents of which I have read and

25   accept, further based on the testimony today, which I

1    accept, further based on my observation of the defendant

2    during the course of the trial and today's hearing,

3    including his attitude, demeanor, degree, and manner of

4    interaction with his counsel, I find by a preponderance

5    of the evidence that this defendant is presently and

6    will into the reasonable future remain competent to be

7    sentenced.  I find that this defendant has a sufficient

8    present ability to consult with his attorney, if he

9    wishes to, with a reasonable degree of rational

10   understanding.  I further find that this defendant has a

11   rational as well as a factual understanding of the

12   proceedings against him and the consequences.  And I

13   find him competent to exercise his right of allocution

14   since I believe he understands the nature of these

15   proceedings.

16           I find by a preponderance that this defendant

17   will remain competent into the reasonable future and I

18   will remain vigilant throughout the remainder of these

19   proceedings regarding that issue.

20           Counsel, we are going to take a short recess.

21   Just a second.  We are going to take a short recess and

22   then we will reconvene and proceed for sentencing.  Is

23   there something you wish to say before we go into

24   sentencing, Mr. Brown?

25           MR. BROWN:  Yes.

1          THE COURT:  Go right ahead.

2          MR. BROWN:  Counsel has tried to withdraw at

3    least three times of record, perhaps four.  My wife and

4    I never accepted counsel from day one.  This Court is

5    aware of this with the contract we submitted to the

6    court in that regards.  He asked if you would accept the

7    contract.  The Court accepted that, yet the Court

8    continuously threw Mr. Iacopino at us against his wishes

9    and against our wishes.  He never presented us properly

10   or the strawman properly, which was our agreement, and

11   the Court accepted that.  We gave the offer.  The Court

12   accepted it.  It was a done deal.

13          However, during the course of the trial, Mr.

14   Iacopino was continually forced to be here when he

15   didn't want to be here and we didn't want him to be

16   here.  And still today he doesn't want to be here.  We

17   just heard 15 or 20 minutes of him working with the U.S.

18   Attorney's Office demonizing me and trying to prove --

19   allude that I am still incompetent even after I've been

20   proven not to be competent.  He doesn't want to be here.

21   We have a hostile attorney here, sir.

22          My counsel -- a couple of my counsel members

23   are out here in the audience and should be sitting here

24   at the table with me.  However, for some reason, again,

25   you deny this.  Is it because we are under

1   administrative law rather than under the proper law of

2   the land?  I know that we don't have any separation of

3   powers anymore in this country.  That's the presidential

4   flag.  It's actually a flag of the bankruptcy.  And this

5   is an administrative court for that bankruptcy.  I know

6   that. These folks up here don't know that.  You, they,

7   and I know that.

8           So my problem is that he can't be here.  He

9   can't represent or re-present me.  I'm already present,

10  sir.  We made that clear as a living soul as created by

11  the creator.  How could this man stand before us?

12          And while we are at it, one more quick thing,

13  sir.  I do believe, sir, I've already had 50 years of

14  bondage by this United States Government.

15          THE COURT:  All right, counsel.  We are in

16  recess.  We'll reconvene shortly for sentencing.

17          (Recess taken at 9:35 a.m.)

18          (Reconvened at 9:45 a.m.)

19          THE COURT:  All right.  Counsel, we are here

20  on the United States of America versus Edward Brown,

21  Criminal Docket 09-30-01.  We are going to proceed with

22  sentencing.

23          I have read the sentencing memorandum filed by

24  the government and by the defendant.  I have reviewed

25  all the objections filed by Mr. Iacopino.  Who will be

1    handling sentencing for the government?

2              MR. HUFTALEN:  I will, your Honor.

3              THE COURT:  Have any victims been notified in

4    this case?

5              MR. HUFTALEN:  All law enforcement personnel

6    who could be classified as victims have been notified

7    and are present.

8              THE COURT:  All right.  Very good.  Mr.

9    Iacopino, you delivered to your client a copy of the

10   Presentence Investigation Report?

11             MR. IACOPINO:  I have attempted to through the

12   jail, your Honor.  Whether he received it or not, I

13   cannot make a representation to the Court.

14             THE COURT:  Okay.  I've reviewed all of the

15   objections filed by Mr. Iacopino.  Let me indicate the

16   nature of my rulings on those objections.  I note that

17   the defendant disputes Paragraph 7 through 9 of the PSI

18   arguing that he never, quote, threatened to forcibly

19   resist, unquote, efforts to arrest him; that Mr. Brown's

20   statements to the media were taken out of context.  I

21   object to any objections to Paragraphs 7 and 8.

22             With respect to Paragraph 9, I note that Mr.

23   Brown did not discharge an explosive device or firearm

24   against a government agent.  Any statement to the

25   contrary will not be taken into account in sentencing.

1          I reject defendant's argument that the Browns

2   did not make any threatening statements and reject the

3   arguments that their statements were to the effect, if

4   they were subjected to imminent force, they would

5   forcibly defend themselves to the death and that they

6   would leave their home either as a free man, free woman,

7   or in body packs.  They did make those statements.

8          The defendant disputes Paragraph 22 as not

9   relevant.  I will not rely on that paragraph in making

10  my sentencing findings.

11         Defendant also disputes Paragraph 23.  I will

12  not rely on that paragraph in making sentencing

13  findings.

14         With regard to Paragraph 27, defendant's

15  objection is rejected.

16         With regard to Paragraph 29, that objection is

17  rejected.

18         MR. BROWN:  You're beautiful.

19         THE COURT:  Let me finish, Mr. Brown.

20  Defendant objects to Paragraph 31.  I will not rely on

21  that paragraph in making sentencing findings.

22         Defendant also objects to Paragraph 32 stating

23  that tannerite is legal and not an explosive device.  I

24  reject that argument and that objection.

25         MR. BROWN:  Who do you work for?  What country

1    do you work for?

2         THE COURT:  Mr. Brown, I know you would like

3    to be here and make your allocution, but if you're

4    thrown out, you will not do that.

5         Defendant disputes Paragraph 35 because it

6    does not reflect the fact that there were no live trip

7    wires on the property when the Browns were arrested.

8    There were in fact no live trip wires at that time, but

9    I otherwise accept the facts in Paragraph 35.

10        Defendant disputes Paragraph 37 stating that

11   Edward Brown did not point a firearm at anyone on the

12   night of his arrest.  I reject this argument.  There is

13   credible testimony at trial to the contrary.

14        MR. BROWN:  That's not true.

15        THE COURT:  Defendant disputes Paragraph 39

16   because it does not reflect the facts that there were no

17   live trip wires on the property when the Browns were

18   arrested.  There were no live trip wires.  I otherwise

19   accept the facts set forth in Paragraph 39.

20        Defendant objects to the three-level increase

21   based on Guideline Section 3C1.3 because he argues that

22   he was not on release at the time of the conduct in

23   Counts 1, 2, 5, and 7 and asserts that the Total Offense

24   Level should be 32.  He also asks for a two-point

25   reduction for acceptance of responsibility.  That

1   objection is denied.

2            I also find that pursuant to Guideline Section

3   5G1.3(a), the term of imprisonment must run consecutive

4   to his current term of imprisonment.

5            All right.  I think I've dealt with the

6   objection.  If there are any others, counsel is free to

7   bring them up.

8            Are there any witnesses for the government?

9            MR. HUFTALEN:  No, your Honor.

10            THE COURT:  Any witnesses, Mr. Iacopino?

11            MR. IACOPINO:  No, your Honor.

12            THE COURT:  Let me hear from the government

13   with regard to sentence.

14            MR. HUFTALEN:  Thank you, your Honor.  Today

15   brings to a close in this court what has been a

16   three-and-a-half-year chapter which has been ugly and

17   dangerous within this district.

18            MR. BROWN:  Look at me.  You're right.

19            THE COURT:  Mr. Brown, this is it, the last

20   chance.  Go ahead.

21            MR. BROWN:  Doesn't matter.  It's not a court.

22            MR. HUFTALEN:  Obviously the Court needs to

23   take into account the factors set forth in Title 18,

24   Section 3553(a), and very briefly for the record, for

25   Mr. Brown's benefit, those factors include the nature

1    and circumstances of the offense and the history and

2    characteristics of this defendant, the need for the

3    sentence to reflect the seriousness of the offense, to

4    promote respect for the law and provide just punishment,

5    the need for the sentence to afford adequate deterrence

6    to criminal conduct, both specific with respect to this

7    defendant, and most importantly in this case, general

8    with respect to his followers and others who share his

9    beliefs.  The sentence also needs to protect the public

10   from further crimes of this defendant as well as provide

11   needed educational, vocational, medical, or other care

12   for this defendant.

13          The facts of this case are well-known to the

14   Court, I understand, and I by no means intend to review

15   many of the facts in this case, but I do want to so that

16   the arguments of the government with respect to the

17   3553(a) factors can be taken in the appropriate context,

18   very briefly review some of the facts as they relate to

19   what was in the house or on the property on the day that

20   Mr. and Mrs. Brown were arrested.

21          As the Court recalls, there were over 20 pipe

22   bombs in the defendant's bedroom.  Those pipe bombs were

23   approximately ten feet from the foot of his bed.

24          In addition to the pipe bombs, the house was

25   filled with improvised explosive devices, many made with

1    16-ounce cans of gunpowder, several with nails and

2    screws and shrapnel taped around the exterior of the

3    cans with fuses into the cans strategically placed

4    throughout the house so that they could be used against

5    law enforcement at a moment's notice.

6          Several of these IEDs were located in the

7    defendant's master bedroom, particularly in the corner

8    where there was also a 50-caliber rifle with a night

9    scope and two other long-range rifles.  The 50-caliber

10   rifle with the night scope in the defendant's bedroom

11   gave him the opportunity to cover the rear of the house

12   from any law enforcement officers who might approach.

13   As the testimony at trial clearly established, a

14   50-caliber rifle was not only capable of firing long

15   range, but is one of the most deadly weapons that anyone

16   in this country can legally own.

17         The second floor hallway of the bedroom which

18   had a balcony view of the main entrance of the house was

19   armed with an assault rifle, seven IEDs, multiple rounds

20   of ammunition, as well as seven of these IEDs, some with

21   nails and screws taped around the outside perimeter, and

22   in addition to that, tear gas canisters that could be

23   easily thrown out the main entrance for anyone who

24   happened to walk into the house either to arrest the

25   Browns or for any other purpose.

1          Guns were throughout the house as were clearly

2    demonstrated in the two videotapes which showed what the

3    house looked like when the Browns were arrested.

4          In addition to the 50-caliber that was in the

5    bedroom covering the rear of the house, there was a

6    50-caliber on the third floor covering the front of the

7    house.  The 50-caliber on the third floor the Court may

8    recall was different in appearance from the other 50-

9    calibers that were introduced in that it was silver, it

10   was larger, and my recollection is that there was

11   testimony that it weighed 47 pounds.  That gun was

12   strategically placed by a large window that covered the

13   front entrance to the house.  There was also in the

14   house a night scope for that rifle.

15         There were assault rifles throughout the

16   house, including in the master bath.  Under the table

17   upon which an assault rife was located in the bathroom

18   was a case of ammunition.  7.62.

19         There was an IED in the laundry room.  There

20   was an IED in the jelly cupboard in the kitchen.  There

21   was det cord, or detonation cord, on the kitchen

22   counter.  In the den where Mr. Brown reportedly, and the

23   testimony established spent many of his waking hours,

24   there were multiple rifles in a gun case directly behind

25   his recliner.  On a window seat directly next to his

1   recliner within his reach was another rifle with

2   multiple magazines all filled ready to be used at a

3   moment's notice.

4           Outside the residence was ringed with

5   improvised explosive devices hanging in the trees.

6   There was tannerite in several of the trees that was

7   packaged in a way with an orange siting label facing the

8   house so that it could be detonated with a high-powered

9   shot from the home.

10          The testimony of Mr. Tanner at trial my

11  recollection is that anyone within the immediate

12  vicinity of tannerite as it was positioned could be

13  seriously injured or killed if not from the concussive

14  blast but from the shrapnel that might emanate from that

15  blast, including the nails that were used to hang the

16  tannerite in the trees.

17          There was also a propane cylinder hanging in

18  one of the trees not with an orange siting label but

19  with a red cross made out of duct tape clearly visible

20  from the house.

21          The spring guns that were found in the house

22  obviously had been set out in the perimeter of the wood

23  line.  I say "obviously" because there was wire found on

24  one tree stump that still had a cotter pin on it, and

25  there was a discharged and destroyed 12-gauge shell at

1    the base of that tree stump indicative of and consistent

2    with what a 12-gauge shell would look like after having

3    been fired through one of the spring guns.

4           Mr. Powell from the ATF lab testified at

5    length with respect to those spring guns, and there was

6    photographic evidence showing wired cotter pins as well

7    as the 12-gauge shell that was found on the ground.

8           That's the backdrop that I would like the

9    Court to keep in mind as it considers the factors that

10   apply in this sentencing for Mr. Brown.

11          The defendant sees -- and I say "sees" in the

12   present sense, but has seen himself for the last several

13   years and sees himself today as righteous and just.  He

14   sees himself as a Patriot.  In fact -- and I will jump

15   forward just for a moment.  On the evening of his

16   arrest, in celebration of recovering property from the

17   dental clinic that had been brought back to his house by

18   the undercover deputy U.S. Marshals, Mr. Brown

19   celebrated by going into the basement and bringing out a

20   case of what he referred to as the Patriots beer, Samuel

21   Adams.

22          He's seen him and he sees himself as a

23   Patriot, but he isn't a Patriot.  He's an individual as

24   Dr. Channell has testified this morning who sees himself

25   as superior, someone with visions of grandiosity.  He's

1    narcissistic, which is consistent with what he has done

2    throughout this case.  He requires others to obey his

3    rules while he flaunts the rules of others.  At times

4    he's invoked the names of deities to support his cause

5    with no tolerance for the views of others who may

6    disagree with him.

7            He's not a Patriot.  He's not a person

8    interested in positive change.  Some people have

9    compared him to wonderful men in our history, such as

10   Martin Luther King and Gandhi.  Nothing could be further

11   from the truth.  Mr. Brown, at least with respect to the

12   actions in this case, has never been motivated by the

13   pursuit of anything positive.  He didn't help a single

14   person in the years that have led up to today's

15   sentencing.  He encouraged others to commit criminal

16   acts.  He influenced others' belief systems to align

17   them with his own.  He destroyed lives.  The impact that

18   he has had on others is immeasurable.

19           Directly within the geography of his

20   residence, he's negatively impacted the lives of all of

21   his neighbors who for a significant period of time lived

22   in fear as he held his compound and invited those who

23   shared his belief structure to his compound.  He

24   publicly voiced his opposition to law enforcement and

25   publicly stated that he would use violence if anyone

1    attempted to arrest him.  Everyone in that neighborhood

2    knew what was going on there and there was nothing they

3    could do about it.  They lived with that for more than a

4    year.

5              He terrified the town officials in the small

6    town where he lived.  One of his co-defendants, one of

7    his associates, Jason Gerhard, you may recall, had

8    videotaped the homes of the town selectmen, of the

9    police chief, and created a video and identified with

10   graphics on that video the names and addresses of all of

11   those individuals.  There were public statements made by

12   Mr. Brown and his supporters denigrating the public

13   officials who served that small community that aligned

14   them with the law enforcement that he so despised.

15             Mr. Brown and his supporters regularly

16   threatened local law enforcement in the name of the

17   chief of police, the county sheriff, state law

18   enforcement officers, threatening to kill any who stood

19   in his way.

20             Mr. Brown threatened the United States

21   Marshal.  Mr. Brown threatened the Assistant U.S.

22   Attorney who prosecuted him on tax charges across the

23   hall in this building.  He threatened the then United

24   States Attorney who allowed that prosecution to go

25   forward, and he threatened the judge who sat on that

1    case.

2              But it wasn't only people in law enforcement

3    and the judicial system who suffered from Mr. --

4              MR. BROWN:  This man's a liar, sir.

5              THE COURT:  Just be quiet.  You'll get a

6    chance if you want -- stop it.

7              MR. BROWN:  Let's see, let's see.

8              THE COURT:  Stop it.  Go ahead.

9              MR. HUFTALEN:  It wasn't only people in law

10   enforcement in the judicial community who suffered from

11   Mr. Brown's rant.  It was his own supporters.

12             Daniel Riley will spend more than the next

13   30 years in a federal prison because he chose to believe

14   in Mr. Brown and adopted Mr. Brown's belief structures.

15   Daniel Riley came to the Browns and did everything he

16   could to support Mr. Brown.

17             Cirino Gonzalez who's serving an eight-year

18   sentence came from Texas at the request of this

19   defendant.

20             Mr. Wolffe brought his wife from Vermont to

21   New Hampshire, and Mr. Wolffe has served two and a half

22   years in federal prison.

23             Most disturbing with respect to his followers

24   who have been sentenced to prison is Jason Gerhard who

25   at the tender of age of 21 years old was influenced

1    beyond a point that Mr. Gerhard could be brought back by

2    this defendant.  Mr. Gerhard, you will recall, was

3    contemptuous to this Court to the end.  Standing up at

4    his sentencing mocking the system before he began his

5    allocution said to this Court:  Before I begin, I'd like

6    to apologize to the victims of my crime, and he turned

7    to the galley and then laughed and waved his arm in the

8    air and said words to the effect of, "Hah, there are no

9    victims."

10           Jason Gerhard was influenced by this man,

11   Edward Brown, and by Mr. Brown's wife.  Jason Gerhard

12   was treated as a son and was brought into their home.

13   He was educated in the ways of Edward Brown.  And you

14   will recall from the sentencing hearing of Mr. Gerhard

15   that he brought the philosophy of Ed Brown to his

16   neighborhood in Long Island, New York.  And when a

17   search was conducted of his home, in addition to weapons

18   that were found, conventional weapons, there was a pipe

19   bomb identical in design and style to the pipe bombs

20   that Mr. Brown manufactured and kept in his home.  That

21   resulted in the closure of the LIE, the Long Island

22   Expressway, and the destruction of everyone within miles

23   of Mr. Gerhard's mother's home in Long Island.

24           This defendant has had more of a negative

25   impact on individuals both within the system and without

1  the system than any other defendant who has passed

2  through this courtroom.

3           The United States Marshal Service tasked with

4  arresting Mr. Brown and his wife, peacefully, politely,

5  and patiently, accorded the defendant and all his

6  supporters the due process of law that our founding

7  fathers established to ensure that we, the people, would

8  live freely, free to live and prosper, free to associate

9  with those of our choosing, and free to live without

10 tyranny.

11          For nine months the United States Marshal

12 Service waited patiently, and for those nine months this

13 defendant tormented violence.  He created at times a

14 carnival-like atmosphere at his home.  He invited

15 families and young children into his property, a

16 property that he had filled with explosives and enough

17 armament to stage his own war.  He invited supporters

18 from around the country and from around the world to

19 join him in his cause, and he made public statements

20 during that time through radio shows, television

21 interviews, and other public statements along the lines

22 that he and his wife would come out as free men and

23 women or in body bags.  There was no doubt that it was

24 his intention to precipitate a violent conflagration

25 with law enforcement.  Law enforcement who was there to

1    effectuate the lawful orders of this court.

2            The United States Marshal Service tasked with

3    arresting the defendant sent letters to the defendant,

4    letters that were introduced in the trial, explaining

5    that there were warrants out for their arrests and

6    requesting that they see reason and that they turn

7    themselves in.

8            There was testimony at trial that the United

9    States Marshal Service engaged in telephonic

10   communication with Mr. Brown on a regular basis early on

11   and sporadically thereafter requesting that he lay down

12   arms and surrender.

13           The U.S. Marshal Service conducted

14   intermittent surveillance of the property and gathered

15   intelligence.  They made observations, and throughout

16   the time period they were there, they refrained from

17   violent confrontation.  They developed a plan to arrest

18   Mr. Brown, as the testimony at trial established by

19   arresting him as he came out to his mailbox.

20           There was testimony by individuals who worked

21   in the Special Operations Group of the United States

22   Marshal Service who testified that they were snipers or

23   counter-surveillance individuals who had positioned

24   themselves around the house the day before and the day

25   of the, quote, Danny Riley tasering incident.  You will

1    recall that one of those deputy marshals testified that

2    he was behind a stone wall and Mr. Brown came out with a

3    .45-caliber in his hand and an assault rifle over his

4    shoulder on a sling with his dog, and he walked around

5    the top of the circular driveway and he was encouraging

6    the dog into the wood line, and the deputy explained

7    that he was there with his partner and he saw Mr. Brown

8    coming in and saw the dog coming in, and he had Mr.

9    Brown sited and he could have fired.  And Mr. Brown's

10   dog came into the wood line and stopped.  Mr. Brown came

11   in and held his handgun, I believe the testimony was, at

12   a 45-degree angle from his body.  The deputy testified

13   that he had his two hands locked on his handgun braced

14   on the stone wall with the sites on Mr. Brown.  But he

15   didn't fire, and the reason he didn't fire was because

16   the orders he had was to watch, collect information, so

17   that Mr. Brown and his wife could be taken into custody

18   peacefully.

19          You will recall that another deputy marshal

20   testified that while wearing a Ghillie suit, he was

21   close to the property line and Mr. Brown was cutting the

22   lawn with his riding mower.  The deputy testified that

23   he was close enough so that the stones being propelled

24   by the blade of the mower hit him through the Ghillie

25   suit as Mr. Brown drove by.  As Mr. Brown drove by, he

1   could have stood up and hit him with the butt of his

2   rifle and knocked him off the lawn mower.

3           MR. BROWN:  Why didn't he?

4           MR. HUFTALEN:  He didn't do that because the

5   Marshal Service had tasked those individuals with

6   gathering information so that they could peacefully,

7   without violence, take Mr. Brown into custody.  That's

8   exactly what they did.

9           There was testimony by another deputy U.S.

10  Marshal that after Mr. Riley started to run back to the

11  driveway toward the house, he blocked the road and he

12  had his rifle pointed at Mr. Riley as he was running

13  down the driveway back to the house.  He testified that

14  he commanded Mr. Riley to show him his hands a number of

15  times, but he didn't.  He said that as he became closer

16  to him, as Mr. Riley got closer to him, he could see

17  that he had something in one of his hands, and he didn't

18  know if it was a handgun.  It turned out to be a coffee

19  cup.  But as he saw him approaching, this deputy stated

20  that he transitioned from his rifle to his taser.  Not

21  knowing if the individual running at him was carrying a

22  gun, he put his lethal weapon down and raised the taser.

23          MR. BROWN:  Why?

24          MR. HUFTALEN:  He did that through his good

25  training and he did that through the commitment of the

1   U.S. Marshal Service to take these people into custody

2   without violence.

3           MR. BROWN:  Lie.

4           THE COURT:  Mr. Brown, you've got to stop.

5   Mr. Brown, I'm going to let this person finish his

6   presentation.  If you are going to interrupt, you are

7   going to leave the courtroom.  You can talk to yourself.

8   Keep your voice down.  This is it.  I know you want to

9   address the Court.  It's up to you whether you are going

10  to do it or not.

11          MR. BROWN:  I will address the public, not the

12  Court.

13          THE COURT:  All right.  Go ahead.

14          MR. HUFTALEN:  You will finally recall that

15  there was a deputy U.S. Marshal who testified that on

16  the day of the tasering incident, he saw Mr. Brown in

17  the tower of the house stack 50-caliber ammunition and

18  raise a 50-caliber rifle pointed at the driveway where

19  the blocking team was positioned.  That deputy testified

20  that he knew the deputy marshals were there.  He knew

21  that they were well within range to Mr. Brown's

22  50-caliber rifle, and he saw Mr. Brown raise the weapon.

23  And his testimony was chilling, as chilling testimony as

24  has ever occurred in this court building I submit to

25  you.  That deputy testified as I stood in that corner of

1   the room that he saw Mr. Brown raise the 50-caliber to

2   his shoulder, and he had him in his sites.  He testified

3   that he was 70 yards away, and after his supervisor had

4   explained the criteria for being on the

5   counter-surveillance or sniper team, he said in response

6   to, "Could you have made the shot," he said,

7   "Certainly."  He said he had Mr. Brown's left temple in

8   his cross hairs, and he watched as Mr. Brown held the

9   rifle, and he said he took out the slack, and when I

10  asked him what that meant, he explained that he pulled

11  the trigger of his rifle about halfway back.

12          At that point Mr. Brown was sitting at the

13  table directly to my right and slightly in front of me,

14  and I could hear his foot tapping under the table.  Mr.

15  Brown realized at that point that he came within two and

16  a half pounds of pressure of being dead.  But he wasn't

17  killed, and the only reason he wasn't killed was because

18  that deputy U.S. Marshal, like every other law

19  enforcement officer in this case, was instructed and

20  well trained and determined to take these individuals

21  into custody without violence.  He said that had Mr.

22  Brown established a cheek weld, that is, raise the butt

23  of the rifle to his cheek, he would have fired.  At that

24  point he had no choice.  He didn't fire.  He was well

25  trained.

1          MR. BROWN:  Me, too.

2          MR. HUFTALEN:  That day I believe I said in

3     closing it was a perfect failure for the U.S. Marshal

4     Service -- or in opening, excuse me.  It was a well-

5     designed, a well-implemented plan that did not result in

6     taking Mr. Brown into custody.

7          Suffering that failure, the U.S. Marshal

8     Service didn't react negatively.  They went back to the

9     drawing board and for nearly four more months continued

10    their vigilance, their patience, and finally, the first

11    week of October, having had the opportunity to insert

12    undercover deputy U.S. Marshals, were able to take the

13    defendants into custody without firing a shot.  Two

14    shots on a taser were all that were fired.

15         That was Mr. Brown's choice.  That night, I'm

16    sure the Court recalls, Mr. Brown held at bay those

17    undercover deputies with an assault rifle.  He pointed

18    it at them clearly as they unloaded the pickup truck.

19    He carried it into the house and placed it on a bench

20    just inside the door where he sat and ate pizza with

21    those deputies a few minutes later.  He had in his

22    waistband a .45-caliber semi-automatic handgun, and his

23    wife had a 9mm Glock in her pants pocket, both of which

24    were fully loaded.  And you will recall from the

25    testimony at trial, that Mrs. Brown held the gun on the

1    deputies when Mr. Brown wasn't there and covered them.

2            Four more months they waited patiently until

3    they could finally arrest this individual.  They did,

4    and that ended the ordeal that innumerable people had

5    suffered for at least the year and, for some, four years

6    leading up.  The U.S. Marshal Service and everyone else

7    involved saved Mr. Brown's life and they saved the lives

8    of many others.

9            With respect to the sentencing factors that

10   this Court should take into account, I submit that a

11   lengthy prison sentence as to Mr. Brown is obvious and

12   necessary.  He can't be allowed to commit crimes against

13   others, and others need to be protected from him.  The

14   Sentencing Guideline in this range -- in this case,

15   taking into account the mandatory minimum consecutive

16   30-year sentence that the Court's obligated to impose

17   results in a sentencing range of 47 and a half to

18   51.8 years, 570 to 622 months.

19           Now, the defense has argued in papers it's

20   filed with the court that any sentence in excess of

21   360 months is excessive and unnecessary.  With respect

22   to the life expectancy of Mr. Brown, that may or may not

23   be a factually correct statement.  With respect to

24   specific deterrence of Mr. Brown, that may or may not be

25   a factually correct statement.  But with respect to the

1    general deterrent message that I believe is the

2    overriding concern that this Court should have, that

3    argument falls flat.

4           The people that Mr. Brown influenced and

5    perhaps was influenced by need to know that if you

6    engage in this type of conduct, if you put yourself in a

7    position where you are inviting others to come in and be

8    killed at his hands or at the hands of his supporters,

9    that you will spend virtually, if not actually, the rest

10    of your life in prison.

11           Jason Gerhard's lawyer saved his life by

12    gaining an acquittal on a 30-year mandatory minimum

13    sentence that he would have been faced with consecutive

14    to the sentence that he received.  It was only by an act

15    of good lawyering that he escaped prison for the rest of

16    his life.

17           Anyone else who follows Mr. Brown or believes

18    in his belief structure or has been influenced by him

19    and intends to act in ways similar to him needs to know

20    that they will most likely spend the rest of their lives

21    in prison, as will Mr. Brown, as will Mrs. Brown, and by

22    and large as will Danny Riley.

23           There are no mitigating factors with respect

24    to Mr. Brown that would counsel the Court to vary under

25    Booker outside the guideline range.  There is nothing

1    redeeming with respect to Mr. Brown's conduct or frankly

2    with respect to the person that Mr. Brown has been in

3    the lead up to this sentencing hearing and the person

4    that he is today that would suggest to the Court that it

5    would be appropriate to go below the guideline range.

6            Some may say sentencing him to 47, 48, 50,

7    51 years is overkill.  I submit that sentencing him to

8    50 years or 47 and a half years isn't overkill and is a

9    statement to others who may be his followers.  The

10   public needs to be protected not only from Mr. Brown but

11   from others who share his belief structure.

12           Mr. Brown has influenced more people than most

13   criminal defendants that this Court sees.  There may be

14   people who have on an acute basis for a discreet period

15   of time in a limited environment put people at equal

16   risk.  There may be bank robbers, there may be drug

17   dealers who have committed crimes that have run the risk

18   of killing people and may have resulted in the deaths of

19   people, but their influence and their reach is narrow

20   and temporally closed.

21           What Mr. Brown has done is expanded his reach

22   to as many people as he could possibly get.  He's

23   attempted to encourage young people to follow his belief

24   structure through the rest of their lives.  It is no

25   overstatement to say that no more dangerous man has been

1    sentenced in this court, nor is it an overstatement to

2    say that no more dangerous man will be sentenced in this

3    court in all likelihood in the coming years.

4           Therefore, on behalf of the United States, I

5    respectfully request that this Court sentence the

6    defendant to a period of incarceration within the

7    guideline range, taking into account the mandatory

8    minimum consecutive sentence of 360 months, to a total

9    sentence of between 570 and 622 months.  Thank you very

10   much.

11          THE COURT:  Thank you.  Mr. Iacopino?

12          MR. IACOPINO:  Thank you, your Honor.  Your

13   Honor, I want to first address -- as part of the

14   memorandum that I filed and in my objection, I had

15   addressed the issue of criminal history category under

16   the guidelines.  I'm going to address that issue first,

17   your Honor.

18          As you know, the Presentence Investigation

19   Report assigns Criminal History Category No. III to Mr.

20   Brown.  I have argued that under the guidelines, that

21   ought to be reduced.  The Court ought to depart

22   downward -- or I guess sideways by one criminal history

23   category to Criminal History Category No. II.  And I'm

24   going to address that before I get into our argument for

25   the sentence.

1          THE COURT:  Go right ahead.

2          MR. IACOPINO:  Thank you.  Mr. Brown's

3   criminal record or lack thereof, your Honor, is before

4   you in the PSI.  As you are aware from that document,

5   from the age of 17 to the age of 65, he garnered no

6   criminal convictions.  He winds up under the sentencing

7   guidelines with six criminal history points because of

8   the nature -- because of his one conviction at age 65 in

9   the tax case, the original case in this court, your

10  Honor, and then he accumulates a number of criminal

11  history points because of his status at the time that he

12  committed these offenses.

13          I respectfully suggest to you that Criminal

14  History Category III normally contains individuals who

15  have many convictions.  They have garnered six points

16  usually through the accumulation of crimes over a number

17  of years.

18          This is not a defendant who has that type of a

19  history before you, your Honor.  All of his time, all of

20  his criminal conduct with the exception of a charge he

21  was pardoned for that occurred at age 17, occurred

22  within the period of time from the beginning of the tax

23  case until his conviction in this particular matter.

24          I respectfully suggest to you that that makes

25  him not a Criminal History Category III.  When you look

85

1    at and compare him to others, he is -- if you look at

2    what he has, more likely he's somebody who has a prior

3    felony conviction that normally would get him into

4    Criminal History Category No. II, and I respectfully

5    submit to you that the Court ought to depart in

6    calculating the guidelines to Criminal History Category

7    No. II, which on the Court's present assessment of the

8    guidelines would make the guideline sentence 188 to

9    235 months.

10            But of course, if I may go on, I'd also intend

11    to ask you to impose a sentence that does not impose a

12    United States guideline sentence, your Honor.  And the

13    reason why -- the primary reason why I ask you to do

14    that, your Honor, is pursuant to 18 USC, Section

15    3553(a)(2)(A), part of your job is to promote respect

16    for the law, to issue a just punishment.

17            Imposing a sentence that the government asks

18    for, essentially 50 years on a 67-year-old man, is in

19    essence imposing an impossibility on him.  It says to

20    the rest of society that we don't care.  We're simply

21    going to go by this chart here.  We're not going to

22    consider what is realistic, number one.  He will not

23    survive the sentence suggested by the government.  He

24    will die in jail.  It will be a life sentence if that's

25    in fact the sentence that the Court chooses to impose.

1         He will get the same sentence of people that

2    murder people get in this court and in other courts,

3    state courts and in other jurisdictions.  And he didn't

4    murder anybody.  His crimes were certainly serious, and

5    nobody's going to say that they are not.  I'm not going

6    to stand up here today and take issue with the United

7    States Marshal Service.  That's not the purpose of

8    today's proceedings.  But what is very clear is that

9    when there was an occasion when -- at least one

10   documented occasion in evidence in this case when Mr.

11   Brown had the opportunity to fire a weapon and possibly

12   harm somebody, he didn't do that.  In fact, he didn't do

13   it on two documented occasions.  He didn't harm anybody,

14   your Honor, and the way that our laws are set up, the

15   harm that you cause to other people is one of the

16   paramount considerations in determining how severely you

17   are punished for your actions.

18        So I respectfully suggest to the Court that

19   when you take into account Mr. Brown's age, 67 years

20   old, that in order to accomplish the goals of sentencing

21   as they are set forth in the sentencing statute, a

22   sentence of 361 months is the most appropriate, and even

23   that is probably higher than necessary, but it is at the

24   bottom line because of the minimum mandatory sentence,

25   what the Court is required to impose as a sentence in

1   this particular case.  That's 30 years and a month.

2              In 30 years Mr. Brown will be approximately

3   97 years old.  Actually, because this sentence runs

4   consecutive to the underlying tax charge he will

5   actually be older than that.  Even if he were to accrue

6   all of his good time earned credit, if he just had 30

7   years to do, he'd get out when he was approximately 92.

8   I respectfully suggest to the Court that that is a very,

9   very, very severe sentence for a 67-year-old man, and

10  that that is a sentence that is more than adequate, more

11  than necessary even though you must impose 30 years.

12  That's more than is necessary to accommodate the goals

13  of our punishment statute, your Honor.

14              If you think about what can happen in the

15  course of 30 years, I was thinking about this before

16  coming up here today.  If I had a 30-year sentence when

17  I was 25 years of age, I wouldn't have had my son.  I

18  wouldn't have met my wife.  I obviously would not have

19  had a career.  Thirty years is an extremely, extremely

20  long period of time.  And in our society those extremely

21  long sentences are generally reserved for people who

22  have in fact killed somebody else.

23              I respectfully suggest to you, your Honor,

24  that in order to accomplish those goals of sentencing at

25  18 USC, Section 3553(a), the sentence of 361 months --

1    and I only add the additional month because under 18 USC

2    I believe it's 3741 requires some consecutive time based

3    on your finding because Mr. Brown was under release at

4    the time of this offense.  It's the only reason why I

5    add the additional month on there, so that you can be

6    technically correct within the statutes.

7           But the sentence of 30 years, your Honor,

8    certainly reflects the serious nature of this offense.

9    It puts him right up there with people who have killed

10   people.  It promotes respect for the law, and it also

11   discourages disrespect for the law because it's

12   realistic.  It's proportional.  You know, if we sentence

13   everybody to the maximum sentence or we sentence

14   everybody to hundreds of months, nobody will respect the

15   law at all.  It affords -- it provides just punishment.

16   As I said, my client will be somewhere in excess of

17   92 years of age when he is released.  It affords more

18   than adequate deterrence to the rest of society and to

19   those people who the prosecutor asks the Court to

20   address this sentence to.

21          Those people are not being sentenced here

22   today, your Honor.  Your actions today will have an

23   effect -- whether or not you like this man, whether or

24   not he likes me or likes you, he is a human being and

25   your actions will affect him today, and 30 years is a

1    mighty long time.  And it's a time that says to other

2    people, hey, you do this you will go to jail for

3    30 years.  You might not see your son be born.  You

4    might not meet your wife.  You might not have the chance

5    to have a career.

6              It's an extremely long sentence and it's a

7    just deterrent under those circumstances, your Honor.

8    It also obviously -- I don't think it can be any more

9    obvious.  It protects the public from any further crimes

10   of the defendant.  First of all, he will be totally

11   incapacitated for 360 months based on a minimum

12   mandatory sentence, your Honor.  That's totally

13   incapacitated.  He won't be able to commit any crimes

14   against society.  Secondly, when he's released, assuming

15   that he is released after a sentence like that, he will

16   be at such an age that quite frankly he will be

17   incapable -- if he's anywhere near normal, which I

18   expect he is, he will be incapable of committing crimes

19   of violence at the very least in the future.  It is --

20   as I write in my memo, your Honor, it is an absolute

21   deterrent to Mr. Brown because it is essentially -- a

22   sentence of 361 months is essentially an incapacitating

23   sentence.

24             Your Honor, the First Circuit has recognized

25   that you have the authority to consider that lengthy

1   minimum mandatory sentence in determining what the

2   balance of your sentence should be.  I'm asking that you

3   do that.  I'm asking that you give him the minimum

4   sentence that the law allows you to provide because

5   given his age and given his unique set of circumstances,

6   that is a sentence that is sufficient but not greater

7   than necessary in order to accommodate the goals of 18

8   USC, Section 3553(a).

9          THE COURT:  Thank you.

10         MR. BROWN:  You're welcome.

11         THE COURT:  With regard to your request to

12  depart from Category III to Category II, that request is

13  denied.  I believe Category III is an appropriate

14  description of the criminal history in this case.

15         All right.  Mr. Brown, as the defendant before

16  this Court for determination and imposition of sentence,

17  you are entitled to and have a constitutional right to

18  address the Court.  You can tell me anything you'd like,

19  including anything that may impact on your sentence.

20  You are also free to say nothing at all.  Is there

21  anything you would like to say?  If you are going to

22  address the Court, don't talk too fast, for the

23  consideration of the court reporter here.

24         MR. BROWN:  I understand, sir.

25         THE COURT:  Use the microphone, if you would.

1          MR. BROWN:  I hope you are all patient here,

2     sir.

3          No one to this day knows who Edward and Elaine

4     Brown are in this courtroom with the exception of a few

5     personal friends that I see back here and a couple of my

6     counsel that are here that I was never allowed.

7          I'm going to explain to you or read to you,

8     which the U.S. Attorney's Office -- I'm just going to

9     read one little paragraph of who we are and what our

10    mission was.

11         THE COURT:  Mr. Brown, I'm having a little

12    trouble hearing you, so if you could just move the mike

13    in your direction.

14         MR. BROWN:  I can't obey anything that you ask

15    me to do, sir.

16         THE COURT:  There you go.  Thank you.

17         MR. BROWN:  Sir, I'm going to read to you just

18    one little page here.  They had three years their time.

19    This is my first opportunity to actually say anything to

20    the Court in our behalf.

21         I don't understand why you disallowed me my

22    evidence.  I don't understand why you are afraid of the

23    truth, and I'm usually not rude to anybody unless

24    someone's attacking me, and you folks have done a

25    wonderful job over the past three years of attacking me

1   from day one.

2           So here's who I am personally.  Commander in

3   chief of the United States Constitution Rangers that I

4   had done up for other rangers in 2001 when they asked

5   me.  We have nothing to do with the militia except we

6   acknowledge their existence and their right.

7           Rangers, with the best intentions of heart,

8   mind, and spirit, and honor, we present to you, the

9   United States Constitution Rangers.  This is for new

10  applications coming in.  The United States Constitution

11  Rangers is a chartered organization of police

12  officers --

13          THE COURT:  Slow down, just slow down.

14          MR. BROWN:  -- is a chartered organization of

15  police officers defending the Constitution and the

16  people of the United States Republic with a history back

17  to the country's formation.  A new charter was accepted

18  by Congress in 1980 establishing the U.S. Rangers

19  Charter, registration No. Txu42-453, with Charter No.

20  37817.

21          Growing numbers of Americans have lost their

22  confidence and faith in the administrators within our

23  government.  Having decided to prepare to protect the

24  United States of America from any conflict between any

25  and all enemies, both foreign and domestic, this

1   organization therefore among other efforts shall

2   investigate citizen complaints regarding constitutional

3   violations of public officials and administrative

4   agencies and make recommendations and reports to

5   Congress, district attorneys, and other interested

6   parties along with taking any and all lawful actions

7   available to it.

8          USC Rangers, as should all good American and

9   God-loving people everywhere, stand on center of all

10  things and keep a check and balance on any extremists.

11  We have no known enemies and will take no sides save one

12  exception.  We will protect and defend the Constitution

13  Republics for the United States, lower case U, of

14  America against all her enemies and the people thereof

15  under God.  We will abide by the original organic

16  constitution and Bill of Rights, contracts of the

17  several states, and for the United States of America.

18  Make note again of the "for."  All of these are

19  republics, each state, under one God.

20         We will ignore as law dictates any laws or

21  orders that violate these constitutions and their

22  corresponding Bill of Rights including any revised laws,

23  statutes, treaties, regulations, etc., that violate the

24  supreme laws of the land.  We will in good faith and

25  abruptly notify anyone that violates the lawful supreme

1    laws of the states and nation and give the opportunity

2    to correct the errors in a timely manner.  If they do

3    not, they will be charged accordingly in law and under

4    the lawful law of the land.

5              All rangers are living souls and should learn

6    and understand the difference between themselves and

7    others designated as persons.  Persons has a very

8    different meaning in law in this courtroom, and that's

9    why they are all capital letters.  Make note, please.

10             United States Constitution Rangers will

11   endeavor to be proficient in their understanding of the

12   Constitution for United States of America, its Bill of

13   Rights, along with the Constitution for the state of

14   which one inhabits.  Rangers will indicate others where

15   it is possible to the best of their ability.  All United

16   States Constitution Rangers will always appear in public

17   in a clean, neat, and appropriate manner.  Rangers will

18   be polite and respectful to all parties in every

19   situation.  Rangers shall keep the peace and aid -- and

20   make note of this very carefully -- and work with any

21   lawful law enforcement officers, county sheriffs, which

22   is the highest of the land, police and police officers

23   whenever possible on needing assistance.  Thank you and

24   welcome aboard.  Edward Lewis of the Clan Brown of the

25   United States Constitution Rangers.

1            This was not done lightly.  This took a lot of

2    forethought back in 2001.  I always understood what was

3    going on pretty well in the country along with thousands

4    of others of us in the country.  I'm basically -- the

5    U.S. Attorney's Office -- he's painted a wonderful

6    picture of how evil a doer I am, but my record and my

7    history shows with one exception when I was at trial,

8    stupidly I turned myself in at the time as the record

9    will show and I served time and the government pardoned

10   me six years later.  However, that was never brought out

11   like many things that the U.S. Attorney's Office didn't

12   bring out.  And that was a sealed file, too.  However,

13   that was brought out.  All the sealed files that this

14   Court has are always sealed until somebody makes a

15   decision to unseal.

16           At any rate my position was to protect this

17   country from day one, ladies and gentlemen.  My country

18   is you, you, you, you, you, all of you.  You, too,

19   marshal, and you knew it.  You all knew it.  You knew

20   it.

21           THE COURT:  Address the Court, Mr. Brown.

22           MR. BROWN:  Sir, I'm addressing them.  This is

23   all for them because they are in danger.  I'm going to

24   get to that.  I might make note to you again on and for

25   the record.  I'm going to expose a cell to you, a

1    criminal in this government, planning to murder millions

2    of Americans and we are aware of it, along with the

3    government is aware of it for the record.  What's about

4    to happen in this country and what's planned for this

5    country is a horror show.

6            You wonder why I'm angry?  You wonder why I

7    took the stand that I took?  I took that stand because

8    we had people coming after me.  I really don't believe

9    that the U.S. Marshals fully know -- I thought they were

10   pretty good dudes, pretty good men and women, but

11   somebody is giving orders and the wrong orders to

12   destroy this nation, and I have -- since 1987, some 23

13   years of investigation into an organization, and we know

14   who that organization is now, a lot of us know it, and

15   it's out there trying to take over this country.  And by

16   the way, ladies and gentlemen, they have already taken

17   it over, and by the way, we never had it to begin with

18   as it turns out.  What a sad state of affairs.

19           So you hear me ranting and raving because I'm

20   angry because you, sir, will not allow me to speak the

21   truth.  So no matter what I say, whether the truth comes

22   out or not, you just simply say frivolous and deny it.

23   For whatever conceivable reason that is, I have no idea.

24   But I know that the Constitution gave us three forms of

25   law to operate under:  Common law, equity, and

1   admiralty.  Could you tell me, sir, what form of law we

2   are operating in this courtroom today?  Is it common

3   law, sir?

4           THE COURT:  Finish your allocution.

5           MR. BROWN:  Is it common law, sir?

6           THE COURT:  I'm not going to answer your

7   question.  Finish your allocution.

8           MR. BROWN:  Of course you're not because you

9   know as well as I know you are operating under an equity

10  admiralty under the aristocracy.  It's not even a

11  democracy.  This is a republic.  I pledge allegiance to

12  a republic.  That's the organic form of law in this

13  nation.  Benjamin Franklin said when he came out of the

14  Meeting House in Philadelphia -- a lady asked what are

15  you giving us, Mr. Franklin?  He said, madam, we have

16  given you a republic if you can keep it, but it must be

17  conducted by honest men.  It hasn't been conducted by

18  honest men since the Civil War.

19          This country, this world is so close to

20  destruction it's unbelievable.  It is caused by this one

21  group of people.  All of this stuff is frivolous to me.

22  We did not harm to anyone.  We are the only victims

23  here.  Oh, the U.S. Attorney comes up, how brilliant,

24  and advises that we have destroyed -- well, the U.S.

25  Attorney's Office has destroyed virtually thousands upon

1    thousands of lives in and around the world.  We have

2    hard evidence of that, too.  I don't have it right here,

3    but I can get it to you, sir, and I have to report this

4    to you because you are the first available federal

5    authority that's right, and that's part of what we are

6    supposed to do.

7          We're supposed to be a republic.  I know you

8    operate under a democracy and something else that's

9    different.  But that's all I've been allowed.  This is

10   all this office has allowed me to do and you have

11   allowed me to do or Mr. Muirhead or Mr. McAuliffe in the

12   first trial has allowed me to do.  I don't understand

13   that at all either.

14         Evildoers?  Lordy, lordy, you brought up how

15   evil I am.  Let me remind you of something.  Let me

16   remind the Court of something.  We haven't hurt a soul.

17   They attacked us.  We didn't attack them.  From the very

18   first day they sent not 30.  They sent 28 agents at us

19   armed with a sniper on the hill to download information

20   from a computer.  Well, hello, we just asked a question.

21   Show me the law of our taxes, from day one.  They said

22   no.  For ten years they said no until finally around

23   2004 they came in with armed agents.

24         So what does the law say that I'm supposed to

25   do when that happens?  I have every right to defend

1    myself against that kind of an action.  I would like to

2    know who the U.S. Marshal's Office is, the U.S.

3    Attorney's Office, or anybody else if they have the

4    authority to come into my office armed to force me to

5    give them information.  That's bogus without proper

6    warrants.  They had a warrant.  It wasn't proper.  We

7    had an attorney check it over and tell us it's true.  It

8    wasn't proper.

9              THE COURT:  Slow down.

10             MR. BROWN:  I'm sorry.  If this Court -- this

11   Court previously never allowed that information.

12             THE COURT:  Slow down.

13             MR. BROWN:  There is so much, sir -- that's

14   why I'm a little fast.  I appreciate the time to be able

15   to slow down.

16             THE COURT:  It's just hard on her to try to

17   keep up with you.  So just don't talk so fast.

18             MR. BROWN:  Because of what the U.S.

19   Attorney's Office did, the U.S. Postal Service did in

20   the inclusion of the different various agencies, we sued

21   them in state court, state tort claim, which we had

22   every right to do.  U.S. Attorney's Office came in -- we

23   didn't know what was going on at the time -- came in and

24   took that case themselves with the help of Judge Jean

25   Burling.  She passed it off and invited me to come back

1   down for the trial and to finish up and it's supposed to

2   be a federal trial.  It wasn't a federal trial.  The

3   action was on private land done by federal people who

4   had no authority to do so.  They in turn turned around

5   and countered.

6        At that point there I put a sign up.  I have a

7   picture of it somewhere, a sign in front of the office

8   buildings saying Zionists -- not Jews.  Jews are my

9   brothers.  Zionists are on everybody's side in the

10  world.  Zionists, Freemasons in particular.  Free will

11  in this country and the government.  For ten years

12  previous to that no one was really bothering me from the

13  IRS or anybody.  Once I get down there, all of a sudden

14  boom!  They hit us like with an Army.

15       I'm concerned.  That really brought -- I

16  didn't tell you, but my mission previous to this was to

17  investigate this criminal element through another

18  organization I had created, UnAmerican Activities

19  Investigations, again, to protect and serve the

20  constitution republics and protect the people of their

21  own.  As far as I'm concerned it's always the people.

22  It's always the society.  We are not violent people.  We

23  can be.  Absolutely.  History now shows we can be if we

24  have to be.  I thought America's history was based on

25  that, understanding what's law, understanding what's

1    going on, and it's benevolence to do what's right even

2    for the world.

3            Anyway, we can fast forward all of this

4    through the entire end and see very clearly that the

5    U.S. Attorney's Office orchestrated and designed this

6    through misdirection, through the news media, which

7    helped them tremendously.  We find out that in the order

8    of St. John's Freemasonry is one of the organizations

9    through Nackey Loeb -- and I talked to Mrs. Loeb back

10   before she passed and had a conversation about all this

11   stuff.  I offered to write for the newspaper.  She

12   refused.  She did tell me a little bit about St. John's

13   and their position, enough to make me more alert, to pay

14   more attention to Freemason organizations.

15           Mr. -- Union Leader, George Wilson -- I mean

16   Concord Monitor, George Wilson, and Valley News, both

17   papers have absolutely demonized us through this entire

18   process.  Margot Sanger-Katz should be up for criminal

19   charges for what she's done to us no matter how many

20   times she put us in danger.  We know Freemason is

21   involved here again.

22           The entire news media, my God, ladies and

23   gentlemen, the entire news media is controlled by a

24   group -- no matter how convoluted it sounds, a group out

25   of Europe known as the Illuminaries.  They used to be

1    called the Illuminatis.  The doctor was kind enough to

2    mention it for me.  It's not history.  It's not theory.

3    It's fact.  I don't know why he wants to deny the fact.

4    Any more than I don't know why as judge you want to deny

5    the facts here.  You don't want to learn the facts here.

6         Let me give you a couple of facts just to show

7    that it's true.  General immunity pertaining to

8    prosecutors, judges, and government agents.  Prosecutors

9    may knowingly file charges against innocent persons for

10   a crime that never occurred, Tenth Circuit, Federal

11   Court of Appeals, Noughten versus Mendel (ph.), 1980.

12   Prosecutor may violate civil rights in initiating

13   prosecution and presenting case.  United States Supreme

14   Court in Unger versus Pacman, 424 U.S. 1976.

15        THE COURT:  Slow down, Mr. Brown.

16        MR. BROWN:  Here immunity extends to all

17   activities closely associated for litigation or

18   potential litigation, second federal court.  And it goes

19   on and on and on.  Supreme Court again, prosecutor may

20   knowingly use false testimony and suppress evidence.

21        Well, Mr. Prosecutor, thank you very much

22   because you have lied so many times in this trial and so

23   did your assistant there and then to see her --

24        THE COURT:  Address the Court, Mr. Brown.

25        MR. BROWN:  And to see her standing there with

1   her assistant over there and hugging each other because

2   they won a case, I guess a couple of folks who are only

3   trying to save their lives and expose the criminal

4   element in their life, that is shameful, and she should

5   have been embarrassed for that.

6          But it goes on.  Prosecutor may file charges

7   without any investigation.  And they did in our case.

8   We know that.  Eighth Circuit court said that.

9   Prosecutor may file charges outside of his jurisdiction.

10          I don't think so.  Not often.  Prosecutor may

11   knowingly offer perjured testimony, Ninth Circuit

12   federal court case under Virginia versus England (ph.)

13   case.  Here's a big one.  The prosecutor can suppress

14   exculpatory evidence.  And, boy, did this Court do me

15   bad and do exactly that, huge.  Every single piece of

16   paper that I brought into this court and witnesses --

17   every single witness I brought into this court was

18   suppressed from the very first day, and you said, Mr.

19   Singal, you said to me we cannot go to the media, I will

20   put a gag order on you folks, on and on and on, and in

21   this case -- and the very next day Concord Monitor,

22   Union Leader, information from the prosecutor's office

23   here slammed us.  The only information they got could

24   have come from them.  Wow.  And you did nothing about

25   it.

1          So I ask a question.  What's going on?  Is

2     this American law?  Again, I repeat how did we have

3     99 percent or to a hundred percent victory in anything?

4     You don't unless it's something awful going on.  That's

5     a conspiracy, folks.  That flag is a presidential

6     federal court United States Code Chapter Three flag,

7     presidential flag of the executive order.  So you are

8     operating under the presidential flag executive branch

9     in this courtroom.  This is supposed to be a separate

10    branch of government, judicial.  You're not supposed to

11    be working under executive.  He's executive.  He's here

12    executive, sir.  You are operating executive.  You are

13    not supposed to do that.  You're supposed to have an

14    unfringed flag in this courtroom.

15         United States Code, Chapter 1 and 2, how do I

16    know this?  Where did I learn this?  I was refused by

17    another bar attorney which is British accredited,

18    registered, like I mentioned English law operates in

19    this courtroom was refused.  I was refused to bring the

20    witness and I still have a list, and he said I didn't

21    present him with a list.  He didn't want the list.  I

22    said I need you to present this as my evidence.  He said

23    I can't present that evidence that way.  Well, how else

24    do you present the evidence?  This is the stuff that

25    would have exonerated us from day one.  I mean, come on,

1    sir.  Here it is.  You can lie -- from the Supreme Court

2    it says you can lie here.  You can suppress all the

3    exculpatory evidence on and on and on, case after case

4    after case.

5            What are we dealing with here?  I have no idea

6    what we are doing here.  I can't consent to this.  I

7    never did consent and I will never consent to this.  I

8    thought you were my heroes.  This Court was my hero.

9    That U.S. Marshal over there was my hero.  She went,

10   yeah, I had a fixation of going up -- I even had --

11   yeah, we got that thin blue line to protect us from this

12   criminal element.  I didn't realize that the criminal

13   element was them, not because I think most of them

14   wanted to be criminals.  I think initially they don't go

15   into it wanting to be criminals.  They want to be good,

16   but something happens.  Like we say, something happens

17   when men cross the line and cross that beltway down in

18   Washington D.C.  They just, like, change.

19           A good example of that was my neighbor, Mr.

20   Breyer, my neighbor, Supreme Court Justice Breyer.  No,

21   wrong one.  Sorry.  Mr. Greenspan.  Before he was into

22   the republic and all that sort of thing, before he

23   became Secretary of the Treasury, and then he changed.

24   And I think somebody had a conversation with him about

25   that, and he said, well, things go on, march on.  March

1    on into what?

2            U.S. Marshals -- those U.S. Marshals, the five

3    that came on that day in October, are alive today

4    because I made a very fast decision.  Again, more

5    suppressed evidence.  And he knew and he made -- not

6    you.  I'm sorry, Mr. Powell, because  I want him to

7    know.  I didn't need a second trial till he brought it

8    up.

9            The U.S. Marshals, Mr. Monier, knew I could

10   have killed all five of those agents easily and

11   lawfully.  Number one, I contacted three of my friends,

12   which were three of my witnesses, to come in to prove

13   that I knew they were marshals at 5 o'clock in the

14   afternoon when they first came in.  That was suppressed.

15   He wouldn't submit the evidence either, okay?

16           Many marshals came in unidentified.  No one

17   said anything.  Oh, we are just friends here.  I already

18   had one of them as a house guest for a few days previous

19   to all this.  So I wasn't concerned.  I knew who he was

20   even then.  Why?  Because he followed me around outside

21   trying to get in position to take me and capture me out

22   there.  I knew that.  Narcissistic, simple, okay?  I'm

23   aware of things that go on around me.

24           THE COURT:  Mr. Brown, just slow down.

25           MR. BROWN:  I'm sorry.  You think you are so

1    smart.  I just observe things.  I'm a researcher.  Here

2    I am digging up all these facts and information.  I

3    really wish I didn't know it now.  I didn't know America

4    was already lost.  But anyway, I'm finished with that.

5              I didn't hurt them and I never pointed my gun

6    directly at any marshal.  I am an NRA instructor, have

7    been for many, many years, and you never point a gun at

8    anything unless you intend to destroy it.  I don't

9    intend to destroy any of this stuff.  A few times I went

10   hunting.  I don't even do that anymore because I love

11   animals so much, and targets.  And the only reason I

12   have guns today really, except for a few collection

13   pieces, is because of the insanity of the United States

14   corporation government out of Washington, D.C., which

15   are planning and have successfully so far to date taken

16   over this country.  They are murdering their own

17   citizens.  We are a nation divided and a nation fighting

18   against itself.  What a shameful bunch of people we have

19   become.  We are over in other countries slaughtering

20   other people in the name of the new American manifest

21   destiny.  I don't think so.

22             Remember, Mr. Singal, you and I come from the

23   same era, and we have been exposed to a lot of similar

24   times and experiences through history.  You may have

25   come from Italy, and I'm out here, but still we've seen

1    a lot of the same things.  You were just brought up a

2    little different than I was.  I was kind of like dumbed

3    down through the years, but I pushed through that stuff

4    and studied on my own.  Dr. Channell said I'm only of

5    average intelligence.  I didn't have any college.  So I

6    had to learn it the hard way, from the street.  But I

7    learned it.  But because I learned the hard way, I will

8    never quit.

9            You can scare me, you can frighten me, you can

10   torture me like you have been doing.  You have attempted

11   to kill me nine different times so far, and I

12   respectfully expect that sometime in the next 18 months

13   or so you will find a way of -- I will have a heart

14   attack or whatever because of this information I'm

15   bringing out and revealing the fact that our world

16   problems for the past 230 years plus, with the exception

17   of this country, were from the Freemasonry.  It's all on

18   the computer.  You can look it up.

19           You can slap five years on me.  I will never

20   last five years.  I was 36 years old, thank you very

21   much, counselor, for your wonderful -- we know that the

22   trial -- they may turn people into snitches all the

23   time.  We know you didn't commit a crime, but we're

24   going to give you 40 years, but if you snitch on

25   somebody else, we'll drop it down to say five or

1   six months or whatever just to get people to snitch.

2           Am I terrified for America?  Oh, yes.  What

3   I've seen recently I didn't even know about two weeks

4   ago.  I see infra-god, another brand of communist

5   organization designed and developed mostly by the U.S.

6   Attorney's Office, again, to snitch on fellow Americans

7   about this and that, whatever else may come up.  32,000

8   strong and growing, and they receive benefits -- perks

9   and benefits from the government for snitching.  So it

10  makes it very attractive.

11          The other thing I find, which I have in one of

12  these envelopes, is this court is in business.  The

13  court itself and its property makes a huge amount of

14  money off of every single criminal prisoner they bring

15  into this courtroom.  They attach instead of bonds, 12

16  milli-bonds.  First they -- and he knows exactly.  He

17  makes a great deal of money off this, U.S. Attorney's

18  Office does.  So does the U.S. Attorney, so does the

19  judge.  You've got a bid bond, you've got a performance

20  bond, and you've got a payment bond.  And the

21  corrections corporation of America out of Nashua,

22  Tennessee, who initially start these off, get sent to an

23  underwriter, an insurance company, and then it ends up

24  being sold internationally.  But every prisoner that is

25  brought in makes millions of dollars, believe it or not,

1    on each one of them.  Yeah, you're smiling.  You should

2    be smiling, U.S. Attorney.

3             THE COURT:  Address the Court, Mr. Brown.

4             MR. BROWN:  I understand.  So this is going on

5    every day.  Now you take this money, these international

6    bankers, this corporation is known as -- let's see.

7    It's known as the United States of America, this

8    corporation that handles this prison system.

9             Now, the corporation known as the United

10    States of America is not the 50 union states like we

11    have always believed and loved our republic.

12             THE COURT:  Just a second, Mr. Brown.

13    (Pause.)  I just wanted to make sure she didn't need a

14    break.  Just slow down because it's hard to keep up with

15    someone who is talking fast.

16             MR. BROWN:  This is the first time, sir, in 10

17    years I've talked -- actually 20 years I'm talking to a

18    government official.

19             United States of America, we can't find it

20    anywhere in the records of where it was created.  We

21    find it on the Constitution of the United States of

22    America.  I'm sorry, the Constitution for the United

23    States of America.  But in 1879 I believe it was, they

24    started a new constitution and killed the old one after

25    the Civil War in the reconstruction, and they call it

1    the Constitution of the United States.  Whoops.  We

2    didn't know that, did we.  We were born into it.

3           So since that new constitution was in, what

4    they did -- what these Freemason lawyers did was to

5    change the Thirteenth Amendment on titles of nobility,

6    and the Fourteenth Amendment did not in fact free the

7    blacks and enslave the whites.  But if you are going to

8    take over a country, you've got to do it slow and easy,

9    especially a country like ours because we will fight.

10   And they have been doing it through subrogation, slowly,

11   subversive, little by little, year by year.  And I have

12   a chronology here where I can show you a good part of it

13   where they have done this year by year, act by act, law

14   by law, and little by little.  They have changed the

15   form of government.  They have changed the form of the

16   law.  I believe it was lost to the courts -- I believe

17   it was in 1976 when they actually finished us off.

18   Yeah, 1979, the quiet war documents the other one.

19   Yeah, we lost to the courts in 1976.  The documentation

20   is in here, in Senate Bill 94-204 and Senate Bill 94-381

21   for evidence.

22          We are guaranteed, and I emphatically will

23   scream at anybody to show me where they have that right,

24   and you hear the anger, to tell me that I can't present

25   my side of the case and why this attorney right here who

1    didn't want to be part of this should have been allowed

2    to leave, and you should never have referred this case.

3    You were always prejudiced on this case because of the

4    cases you heard last year with Mr. Gerhard and the other

5    two gentlemen, three gentlemen.  You had preconceived

6    ideas, misconceptions.  None of these men that I'm

7    supposed to have destroyed their lives did I destroy

8    anyone's life.  I'm trying to save their lives, your

9    life, Mr. U.S. Attorney, and the judge's life, and

10   everybody else's in this country.  That's my job whether

11   you like it or not, whether I like it or not.  I swore

12   to do this.

13          I shake my head in shame.  My fellow

14   Americans -- I guess you guys aren't Americans anymore.

15   I don't know what you are.  I don't know what you are

16   trying to do.  We don't need you.  We really don't need

17   you.  We can do just fine without lawyers and judges.

18   We need people who know how to adjudicate our situation.

19   Common law was fine and wonderful.  If we remember, the

20   last common law court I saw was about 20 years ago, and

21   it's all on the same level.  Nobody sits above anybody

22   else in a court of law under common law.  It's a few

23   thousand years old, trial and error, developed

24   wonderfully, but we had a very neat form of law.  That's

25   why it was experimental.  You've got to use up what is

1   experimental.

2         THE COURT:  You have another ten minutes.

3         MR. BROWN:  Of course.  They had several days.

4         THE COURT:  Go ahead.

5         MR. BROWN:  And this is why I rush, sir,

6   because I always get cut off, and it doesn't matter what

7   I say because you are just going to impose sentence,

8   frivolous, you did this.  No, I didn't hurt those men.

9   They destroyed us.  The Freemasons, the Jesuits, the

10   Zionists, the St. John's, the Knights Temple.  Even the

11   KK was a Freemason organization.  It goes on and on and

12   on.  Ranger Society, nice order, Maternal Order of

13   Police, Moose Lodge.  They're everywhere.  These

14   organizations, they hand pick people and put them in

15   positions of power in every town, every county, every

16   state, and in every nation.  No matter how crazy it

17   sounds, that's what's been going on.

18         Do we now know and understand that Abraham

19   Lincoln was killed by these Freemasons because of what

20   he was doing to the monetary system?  Do we know that

21   John F. Kennedy was assassinated for the same thing Mr.

22   Lincoln was doing?  Yes, we do.  Bobby Kennedy would

23   have done the same thing.  What did they do?  They went

24   and said, ooh, young John-John Kennedy had a plane

25   accident.  No, they killed him because he was a senator

114

1    that they knew we would have elected him hands down, and

2    they knew he would have gotten revenge and gone back

3    after the U.S. Attorney's Office and Freemasons, and it

4    goes on.

5              THE COURT:  Mr. Brown, did you say the Moose

6    Lodge?

7              MR. BROWN:  It appears that they are.  Maybe

8    not, but it appears that they are.

9              So would you discredit me for one error, sir?

10             THE COURT:  No, I'm just wondering.

11             MR. BROWN:  We have hundreds of others that

12   are private Freemasonry worldwide, because this is

13   usually what they have done.  You've got to admit, sir,

14   that you are of a Freemason organization.  Are you not?

15   Of course.  The bar association, which is British, and I

16   have the entire British information here, that Britain

17   still owns this country.  You can smile, ma'am, but here

18   it is right here.  It's on the record.  It's on the

19   computer.  The Treaty of Paris shows it.  Common law

20   shows it, that this country is owned by Britain.  I'm

21   just a researcher.  I can make mistakes, but guess what?

22   I didn't.  You just don't want to believe them.  But

23   that's okay.  At any rate, the bar association is --

24             THE COURT:  Slow down.

25             MR. BROWN:  -- is a British accredited

1   registry organization, which the ends of court is for

2   judges.  And we find that the Knights Temple seen or

3   appears or integrated this court.  And before any member

4   of the bar association can become a private organization

5   member, which they are not licensed by any state.  They

6   have a little license by the bar.  It's like a dental

7   bar or some baseball club bar association.  They are

8   making laws here.  Golly, gee.  And they are everywhere.

9   They stand at the bench, a lawyer, and the clerk of

10  court, a lawyer, over here, a lawyer, this man right

11  here, another lawyer.  We find that every single lawyer

12  in government is subject for charges and arrest.  Not

13  all lawyers now.  Ones that pertain to government

14  because they are now under suspicion for what they do.

15  They are dedicated and sworn to protect the secrecy of

16  the bankruptcy of 1973 or to reconstruct now this whole

17  order.

18           Here it says right in here, again, lawyers

19  don't have to represent me.  They don't represent me.

20  They represent the court first, they represent the

21  public second, and they represent themselves third.  And

22  if there is any conflict of any of those, they have to

23  go back to the court and represent the court and respect

24  the court.

25           Well, in that -- by the way, this is in the

1    encyclopedia of law.  You can read that.  You are

2    operating under commercial law is another one.  This

3    Court is operating under commerce.  That's why the big

4    bonds.  Bonds, we are all in bondage.  Every single

5    American is under bond.  We haven't even talked about

6    the birth certificates.  And the birth certificates,

7    sir, there is a million-dollar bond attached today to

8    every person who uses the department of commerce.

9            Would you like me to prove that, sir?  I can

10   do that.  He knows about it.  U.S. Attorney's Office

11   knows about a lot of things.  He mentioned this, that

12   I'm delusional.  I created this whole thing about Waco

13   and Ruby Ridge with Mr. Weaver, Waco, Murrah Building,

14   TWA, and the trade center, and I say that they did it.

15           Sir, I don't lie.  I don't lie to anybody

16   about anything, and that's -- I get very angry when

17   someone tells me I do.

18           I'm saying to this Court, fact of record, fact

19   of record, a thousand times the U.S. Attorney's Office

20   is right up to here in the murder of those people in all

21   of those locations.  That's the enemy and the cell that

22   we are concerned about in this country is the bar

23   association.  They have usurped a form of government,

24   and I think it's high time we had another rebellion

25   here.  We really need one badly.  They are murdering

1   people all over the world through the state departments.

2   They are in every town and community, and remember,

3   every bar association attorney is also a Freemason just

4   by having the bar association tag.  That's sad.  What

5   are we doing here to each other?

6           So as a member of the bar, I don't expect you

7   to do anything except have me killed.  Why would you --

8   I've just identified who you were.  I know most of the

9   media back out here.  I know you guys.  But I was

10   brought up to stand on facts, for the truth, for the

11   facts, for honesty, and I'm going to do it to the death,

12   and I don't care what you guys do.  Bunch of cowards.

13   You don't stand up for nothing except your own personal

14   beliefs.  You're filthy rich already.  I know you are.

15   You've got a wonderful retirement package.  His is huge.

16   They are all huge.

17           THE COURT:  You've got three minutes.

18           MR. BROWN:  Of course.  I will not turn aside

19   my direction.  My course is clear.  The U.S. Marshal men

20   are alive because I made a conscious decision not to

21   hurt them, because I don't want to hurt anybody.  But

22   I'm going to protect myself and my family, and it says

23   it crystal clear in the law, even in your statutory law,

24   if you were from New Hampshire, RSA 627:7.  I can use

25   equal or greater force against anything that threatens

1    my life or my property.  Read it.  It's there.  Against

2    any oppressive, including government.

3           And the only reason we have guns in this

4    country today is originally under the Second Amendment.

5    And 2A of the State of New Hampshire is against the

6    government.  I am anything but anti-government, sir.  I

7    am the government.  And you can scowl all you want, sir,

8    but you are the enemy.

9           And so you can quiet me and kill me and

10   torture me and gas me -- and they did gas me, sir.

11   That's on the record, and we have the record.  And you

12   can lie all you want.  You lied about over 50 percent of

13   the things you said up there to this court.

14           THE COURT:  Address the Court, Mr. Brown.

15           MR. BROWN:  -- to this Court.  Again, I'd love

16   the opportunity, again, to strip search this man here

17   and he's probably 20 years my junior, okay, to discuss

18   reality in American terms.  Because not this Court, not

19   him, not this attorney or anybody else is going to tell

20   me I'm anything but horrible, and I would never hurt

21   anybody unless you threatened my life.  And the U.S.

22   Marshals were trying not to do so, but they would have.

23   As the U.S. Marshal said at the trial, he would have

24   killed me in a second if I'd raised that gun.

25           The law says if you come at me with tanks, I

1    can use tanks.  And you guys send A10 Warthog tank

2    busters over my house on several occasions, three tanks,

3    two helicopters, aircraft, over and over again, 200 plus

4    armed battle- dress uniformed soldiers, three sniper

5    teams around my house on the 4th of June.  That's

6    disgusting.  And you did in fact fire bullets beside

7    Danny Riley's head.  He is an ex-military police

8    officer, and he knows the difference, and Danny Riley

9    doesn't lie.

10          If anyone's criminally insane or delusional,

11   sir, you are.  Here are my facts.  You never saw my

12   facts.  I only saw your lies.  I only saw this court's

13   lies.  I saw the suppression of this Court not allowing

14   me to put these facts forward or my witnesses forward.

15          THE COURT:  Thank you, Mr. Brown.

16          MR. BROWN:  Of course.

17          THE COURT:  All right.  The Court has --

18          MR. BROWN:  I had one hour.  They had 15

19   years.

20          THE COURT:  The Court has carefully reviewed

21   the contents of the Presentence Investigation Report.  I

22   take those contents into account.  I've also considered

23   what I heard from counsel, the evidence presented at

24   this hearing, and the contents of the allocution of this

25   defendant.  I've indicated my rulings on disputed

1   issues.

2            Are there any other disputed issues that I

3   neglected to rule on, Mr. Iacopino?

4            MR. IACOPINO:  Not that I can think of, your

5   Honor.

6            THE COURT:  All right.  At this time I make

7   the following guideline calculations.  I find the facts

8   as set forth in the presentence report as amended in the

9   addendum except as set forth in response to objections.

10           Count 1, conspiracy to prevent officers of the

11  United States from discharging their duties, the Base

12  Offense Level is 14.  Instant offense involved

13  threatening physical injury to a person in order to

14  obstruct justice.  Base Offense Level is increased by 8

15  for a total of 22.

16           The instant offense resulted in substantial

17  interference with the administration of justice.  The

18  Base Offense Level is increased by 3 for a total of 25.

19           Pursuant to Section 3B1.1(a) of the

20  guidelines, the offense level is increased 4 levels for

21  a total of 29.

22           Defendant committed the instant offense while

23  on release for the tax offenses in Docket No.

24  06-71-01-02.  Therefore pursuant to 3C1.3, there is an

25  increase of 3 levels for a total of 32.

1          Count 2, conspiracy to commit offenses against

2     the United States, the offense level is 10.  Pursuant to

3     3B1.1(c) the offense level is increased 4 levels for a

4     total of 14.

5          Defendant committed the offense while on

6     release for the federal tax offenses, therefore there is

7     an increase of 3 levels to 17.

8          Count 5, felon in possession, the instant

9     offense involved a semiautomatic firearm that was

10    capable of accepting a large capacity magazine.  Base

11    Offense Level is 20.  Instant offense involved between 8

12    and 24 firearms.  Four levels are added to make it 24.

13    One of the firearms had an obliterated serial number.

14    That results in another four-level increase to 28.

15          Again, pursuant to Section 3B1.1(c) the

16    offense level is increased 4 levels for a total of 32.

17    The defendant committed this offense while on release

18    from the federal tax offenses as already mentioned.

19    There is an increase of 3 levels to 35.

20          Count 7, obstruction of justice, the Base

21    Offense Level is 14.  Instant offense involved

22    threatening physical injury to a person in order to

23    obstruct the administration of justice.  The Base

24    Offense Level is increased by 8 to 22.

25          The instant offense resulted in substantial

1   interference with the obstruction of justice.  The Base

2   Offense Level is increased by 3 to 25.  Pursuant to

3   3D1.1(c) the offense level is increased 4 levels to 29.

4   This offense was committed while the defendant was on

5   release for federal tax offenses, increasing it by 3

6   levels to 32.

7           Count 9, failure to appear for sentencing,

8   Base Offense Level is 6.

9           Count 10, failure to appear for sentencing,

10  Base Offense Level is 6.  The counts are grouped

11  together pursuant to 3D1.2(c).  Therefore the combined

12  offense level is determined by using the highest offense

13  level of the counts, which in this case is Count 5.

14  Felon in possession results in a combined offense level

15  of 35.

16          Defendant has a Criminal History Category III

17  resulting in a guideline range of 210 to 262 months.

18  The sentence for Count 3 is a minimum of 30 years of

19  imprisonment which is consecutive to any other sentence.

20          The defendant is not eligible for probation.

21          The term of supervised release on Count 3 is

22  three to five years.

23          Fine range is $20,000 to $200,000.

24          Special assessment fee of $700 is mandatory.

25          Government have any objection to the guideline

1   calculations?

2           MR. HUFTALEN:  No, your Honor.

3           THE COURT:  Reserving all your prior

4   objections, Mr. Iacopino, do you have any additional

5   objections?

6           MR. IACOPINO:  No, your Honor.

7           THE COURT:  The term of the sentence I'm

8   imposing is sufficient but not greater than necessary to

9   effectuate the goals of 18 USC, Section 3553(a).

10           In setting this sentence, I've carefully

11   considered the sentencing range set forth in the

12   advisory lines.  I of course give the guidelines no

13   controlling weight.  I've also taken into account all

14   the factors set forth in 18 USC, Section 3553(a), and,

15   in particular, the following factors:  The nature and

16   circumstances of the offense, the seriousness of the

17   offense, the need to promote respect for the law, the

18   need to --

19           MR. BROWN:  Right.

20           THE COURT:  -- impose just punishment, the

21   need for deterrence -- Mr. Brown.

22           MR. BROWN:  Would you take me out, please.

23   I've had enough of this trash.

24           THE COURT:  All right.  Mr. Brown is free to

25   leave the courtroom.  Goodbye, Mr. Brown.  Take him out.

1          (Mr. Brown exited the courtroom.)

2          THE COURT:  -- the need to protect the public

3     from further crimes of this defendant, and the impact of

4     the crime on the victims here.

5          The record should reflect at this point Mr.

6     Brown has requested to leave the courtroom during

7     sentencing.  That request was granted.

8          In many ways Mr. Brown is a very lucky man to

9     be living in this country.  There are many countries in

10    the world that if he had disobeyed a court order, he

11    wouldn't have been sitting in his home for nine months

12    threatening government officials who were trying to

13    enforce a court order.  Despite Mr. Brown's feelings

14    about the government, most governments in the world

15    today would have executed the sentence promptly and most

16    likely have executed Mr. Brown quite promptly.

17         Mr. Brown is an individual who takes the

18    benefits of the society that he lives in with regard to

19    freedom of speech, freedom to publish, the right to due

20    process, yet wishes to deny those freedoms to others.

21    Mr. Brown engaged in a long period of lawlessness and

22    endangered multiple government officials in the

23    discharge of their duties.

24         It's clear to me that Mr. Brown is entirely

25    unrepentant.  His words are, quote, I will never quit,

1   unquote.  He prides himself on the fact that he could

2   have killed a number of marshals, yet through his

3   inherent goodness failed to do so.  I have no doubt in

4   my mind that Mr. Brown would have killed multiple

5   marshals if they hadn't dealt with him so effectively.

6          So the actions of Mr. Brown are reprehensible.

7   The seriousness of the offense is high, and I believe a

8   severe punishment is necessary to promote respect for

9   the law and to deter others who attempted to engage in

10   this type of conduct.

11          Mr. Brown confuses the ability of people in

12   this country to promote their views with his decision

13   that everyone must agree with him.  Mr. Brown would deny

14   the right to others of their beliefs merely because they

15   conflict with his.  Surprisingly, or not surprisingly,

16   that's his right in this country.

17          This is a very sad case in many ways.  It's

18   very sad that Mr. Brown and his beliefs caused others to

19   be entrapped in his way.  Mr. Riley who will in all

20   likelihood never leave prison, Mr. Gonzalez who, though

21   he received a shorter prison sentence, has apparently

22   been irrevocably tainted by these views, and I fear for

23   Mr. Gonzalez's future, Mr. Wolffe whose life has been

24   totally disrupted because of Mr. Brown, and most

25   pathetically Mr. Gerhard, a young student who was drawn

1    into the beliefs espoused by Mr. Brown is serving a

2    severe prison sentence because of his involvement with

3    the weapons and explosives.

4              Regardless of Mr. Brown's belief and his

5    views, I was hoping for some indication of remorse of

6    what occurred to these others.

7              Mrs. Brown, who has now been sentenced to --

8    in all likelihood is the rest of her natural life in

9    prison, perhaps an indication of remorse that his wife,

10   a woman who lifted herself up by her boot straps to

11   become a dentist, must serve most likely the rest of her

12   life.  An indication of remorse, sympathy, or sadness

13   might have been appropriate.

14             And what is perhaps the saddest of all in

15   terms of Mr. Brown is an individual who throughout his

16   life never quite garnered the stature that he believed

17   he deserved until the media, because of his views in

18   this case and his threats to the government, gave him

19   the glory that he felt he deserved all along.

20             Someone once said that everyone gets their

21   fifteen minutes of fame, and Mr. Brown unfortunately was

22   revelling in his during the course of his conduct.  His

23   fifteen minutes ran out.

24             I will impose sentence at this time.

25             Pursuant to the Sentencing Reform Act of 1984,

1   it is the judgment of this Court that the defendant,

2   Edward Brown, is committed to the custody of the Bureau

3   of Prisons to be imprisoned for a term of 72 months on

4   Count 1, 5, and 7; 60 months on Count 2 to run

5   concurrent with Counts 1, 5, and 7; 12 months on Count 9

6   and 10 to be concurrent with the terms imposed on Counts

7   1, 2, 5, and 7; and 360 months on Count 3 to be served

8   consecutive to the terms imposed on Counts 1, 2, 5, 7,

9   9, and 10, for a total term of 444 months imprisonment.

10          That is less than the government requested.

11   Mr. Brown lives in a country where a sentence that is

12   sufficient but not greater should be imposed.

13          The term of imprisonment imposed by this

14   judgment shall run consecutive to the defendant's term

15   of imprisonment under any previous state or federal law

16   sentence.

17          Upon release from imprisonment, this defendant

18   shall be placed on supervised release for a term of

19   three years.  This term consists of terms of three years

20   on each of Counts 1, 2, 3, 5, 7, 9, and 10, all to run

21   concurrently.

22          Within 72 hours of release from the custody of

23   the Bureau of Prisons, the defendant shall report in

24   person to the probation office in the district to which

25   he is released.  While on supervised release, the

128

1    defendant shall not commit any other federal, state, or

2    local crime and shall comply with the standard

3    conditions previously adopted by this Court, and shall

4    comply with the following additional conditions:

5              He shall not illegally possess a controlled

6    substance.

7              He shall not possess a firearm, destructive

8    device, or other dangerous weapon.

9              Pursuant to public law, the defendant shall

10   submit to DNA collection while incarcerated at the

11   Bureau of Prisons or as directed by the probation

12   office.

13             The drug testing condition is suspended based

14   on my determination that this defendant poses a low risk

15   of future substance abuse.

16             The defendant shall pay any financial penalty

17   imposed by this judgment that remains unpaid at the

18   commencement of the term of supervised release.

19             In addition, the defendant shall comply with

20   the following special condition of supervised release.

21   He shall submit his person, residence, office, or

22   vehicle to a search conducted by the probation officer

23   in a reasonable time and in a reasonable manner based on

24   a reasonable suspicion that contraband or evidence of a

25   violation of the term of supervised release may exist.

1    Failure to submit to the search may be grounds for

2    revocation.

3            The defendant shall warn any other residents

4    that these premises may be subject to searches pursuant

5    to this condition.

6            The Court finds that this defendant does not

7    have the ability to pay a fine and I am waiving the fine

8    in this case.  Defendant is ordered to pay a special

9    assessment of $700 which shall be due and payable

10   immediately in the form of a lump sum payment.

11           This defendant, as I've earlier indicated, has

12   a right to appeal the conviction and the sentence.  Mr.

13   Iacopino, you are aware that this right of appeal must

14   be exercised in writing within ten days of today and not

15   after that, and that if there is a failure to file a

16   written notice of appeal within that period of time, the

17   rights of appeal will be waived.  Mr. Iacopino, I would

18   request that you inform your client of his rights of

19   appeal and inform him further that if he cannot afford

20   an appeal, the appeal will be filed by the clerk without

21   cost.  You may wish to file an appeal on behalf of your

22   client in any event.

23           MR. IACOPINO:  Your Honor, just to address

24   that point, as I've indicated to you today, Mr. Brown

25   does not communicate with me.  I doubt that we would

1   ever get to a spot in a conversation where he would

2   direct me to file a notice of appeal.  It is my

3   intention to file the notice of appeal today and to

4   inform Mr. Brown -- well, I also intend to move to

5   withdraw from representing Mr. Brown on appeal and ask

6   that counsel from the appellate panel be appointed to

7   represent him in the First Circuit so that somebody else

8   can take a fresh look at the record.  I would also tell

9   Mr. Brown that he should try to communicate with that

10  counsel.

11          THE COURT:  Thank you, Mr. Iacopino.  I'm sure

12  that the circuit will appoint counsel.  Is there

13  anything else from the government?

14          MR. HUFTALEN:  No, your Honor.

15          THE COURT:  Mr. Iacopino, anything else?

16          MR. IACOPINO:  Nothing else, your Honor.

17  Thank you.

18          THE COURT:  Defendant is remanded in execution

19  of sentence.  We're in recess.

20          (Adjourned at 11:30 a.m.)

21

22

23

24

25

131

1

2                           C E R T I F I C A T E

3

4            I, Diane M. Churas, do hereby certify that the

5    foregoing transcript is a true and accurate

6    transcription of the within proceedings, to the best of

7    my knowledge, skill, ability and belief.

8
     Submitted: 7-23-10
9                                /s/  Diane M. Churas  __
                                 DIANE M. CHURAS, LCR, CRR
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25